STROUD, Judge.
 

 *35
 
 Plaintiff Leonora Moriggia ("plaintiff") appeals from the trial court's order granting defendant Linda Castelo ("defendant")'s motion to dismiss under Rule 12(b)(1) and dismissing plaintiff's complaint for lack of standing. On appeal, plaintiff argues that she has standing to maintain an action for custody and that defendant acted inconsistently with her parental status by intentionally and voluntarily creating a family unit and making plaintiff a
 
 de facto
 
 parent. Because the trial court's findings of fact do not support its conclusion that plaintiff has no standing to maintain a custody action, we vacate the order and remand for further proceedings.
 

 Background
 

 Plaintiff's complaint alleged that plaintiff and defendant were a lesbian couple who never married but "were in a committed and loving relationship from January 2006 until October 2014[.]" The couple decided during the relationship to have a child. Defendant was selected to carry the child because plaintiff had already experienced a pregnancy when she gave birth to her biological daughter, Trisha,
 
 [1]
 
 whom
 
 *36
 
 she brought into the relationship. Both parties' eggs were harvested, but after attempts at artificial insemination were unsuccessful, they agreed to use a donor sperm and donor egg. On 11 June 2013, the minor child, Raven, was born.
 

 The parties separated in October 2014, and on 11 March 2015, plaintiff filed her complaint for child custody seeking joint temporary and permanent custody of Raven. Defendant answered on 1 May 2015 with a motion to dismiss and alternative counterclaim for child custody, seeking sole legal and physical custody. In her motion to dismiss plaintiff's complaint, defendant contended that plaintiff "is not a parent of [Raven] either legally or biologically" and argued that she "does not have standing to bring and maintain a child custody action against Defendant, who is [Raven]'s legal and physical mother." The hearing on temporary custody and defendant's motion to dismiss was held on 21 July 2015, and the trial court took the motion to dismiss under advisement. On 4 January 2016, the trial court entered an order dismissing plaintiff's complaint for child custody for lack of standing.
 

 The trial court's order found, in relevant part, that:
 

 7. Plaintiff and Defendant were involved in a romantic, homosexual relationship and considered each other to be life partners.
 

 8. Plaintiff and Defendant lived together from January 2006 until December 2008, at which time they separated, and then resumed living together from January 2010 until October 2014.
 

 9. The parties broke off their relationship in October of 2014 but continued to live together in the same residence until Plaintiff left on February 14, 2015.
 

 10. Plaintiff filed this custody action on March 11, 2015.
 

 11. When the parties briefly separated in December of 2008 ... Defendant would have visitation with [Trisha] and [Trisha] would frequently spend the night with Defendant at her residence.
 

 12. During the parties' relationship they discussed their family and together planned on adding at least one child to their family.
 

 13. Beginning in 2012, the parties attended appointments at Carolina Conceptions where they discussed
 
 in vitro
 

 *37
 
 fertilization. Both parties jointly signed a contract with Carolina Conception for the conception of the minor child, [Raven], in this matter.
 

 14. The parties discussed using artificial insemination as a means of getting pregnant
 
 *380
 
 and it was agreed Defendant would go through the pregnancy....
 

 15. When the Defendant was determined to be infertile, the Plaintiff's eggs were harvested in an attempt to artificially inseminate the Defendant; however, the Plaintiff did not produce enough eggs for the procedure.
 

 16. The parties then discussed and researched adoption, both attending an informational meeting; however, shortly thereafter agreed that the adoption process was not for them because of the cost and potential for the biological parent to attempt involvement with any potential adoptive child. Plaintiff and Defendant nonetheless decided to continue seeking to enlarge their family. The parties then went back to Carolina Conceptions and elected to proceed with the artificial insemination process using donor sperm and donor egg through the anonymous process.
 

 17. Defendant ultimately became pregnant via
 
 in
 

 vitro
 
 fertilization by a donor sperm and a donor egg. Plaintiff and Defendant share no genes with the child and have a completely different genetic code.
 

 ....
 

 19. Once the parties became aware that Defendant was pregnant, they made an announcement to [Trisha] welcoming her into the "Big Sister's Club.".... Defendant told [Trisha] that she was [Raven]'s big sister.
 

 20. On August 29, 2012, Defendant was listed as Recipient and Plaintiff as "Partner", collectively they were referred to as "Recipient Couple". The parties acknowledge in the Contract that any child resulting from the procedure will be their legitimate child in all aspects, including descent and distribution as our child....
 

 21. Plaintiff contended that her $5,575 check made out to Carolina Conceptions was a contribution to the $20,000 overall cost and was intended by Plaintiff to create a
 
 *38
 
 family with Defendant. She also testified that she owed the Defendant these funds as satisfaction of an outstanding debt Plaintiff owed to Defendant.
 

 22. Defendant contends that the $5,757 [sic]
 
 [2]
 
 was in satisfaction of an outstanding debt Plaintiff owed Defendant.
 

 23. The parties also pulled a combined $18,000 out of their 401(k) retirement accounts combined to pay the costs of the artificial insemination procedure.
 

 ....
 

 25. Prior to the pregnancy, the Defendant intended that Plaintiff serve as a parent to [Raven]. At the time of [Raven]'s birth, Defendant had changed her mind as to Plaintiff's role as a parent to [Raven]. She began excluding Plaintiff from any parenting role, insisting that she, alone, be treated as [Raven]'s mother.
 

 26. The parties planned the baby's nursery together, Plaintiff's friend purchased [Raven's] crib. [Raven's] dresser and other furniture and some clothing for the baby were purchased using a gift card received from the baby showers.
 

 27. There were two baby showers. One shower was held in New Jersey on Defendant's behalf, and Plaintiff and Defendant's family contributed financially toward the shower. Half of the people in attendance were Plaintiff's family and friends.
 

 ....
 

 30. Just before Defendant went into labor, Plaintiff and her mother thoroughly cleaned the family's home to get it ready for [Raven]'s arrival. The Defendant posted a note thanking her "mother in law" for assisting in the cleaning for "our daughter".
 

 31. During the artificial insemination process with Carolina Conceptions, Plaintiff would be included in the
 
 *39
 
 email communications. Defendant would refer to Plaintiff and Defendant as "We" when inquiring about the next steps and would sign the email as "Linda & Lee".
 

 32. The Plaintiff attended all of the Defendant's ultrasound and other prenatal appointments
 
 *381
 
 unless the appointment was just to take her blood pressure since she was an at risk pregnancy.
 

 33. The Plaintiff and Defendant both attended the recipient classes required by Carolina Conceptions and parenting classes during Defendant's pregnancy.
 

 34. During Defendant's pregnancy she sent an e-mail to Plaintiff indicating how much she loved Plaintiff and couldn't wait to raise the "niblet" together.
 

 35. Plaintiff has a bond with [Raven]. [Trisha] also has a bond with [Raven].
 

 36. Defendant encouraged a sisterhood between the children, [Trisha and Raven], and the sisterhood was to be permanent and ongoing well beyond the parties' life time.
 

 37. The Defendant once gave Plaintiff a Mother's Day card addressed to "Leemo" on [Raven]'s behalf.
 

 38. In a text, Defendant assured Plaintiff after they separated that she would continue to see [Raven] as she was her "mama too".
 

 39. Plaintiff and [Trisha] lived with Defendant during conception, birth and for the first twenty (20) months of [Raven]'s life.
 

 40. Only the Defendant's name appeared on the Birth Certificate on the announcement of the child's birth.
 

 41. After the birth of [Raven], Defendant sent an email to Carolina Conceptions thanking them on behalf of [plaintiff], Big Sister [Trisha] and Baby [Raven]. She states, "[Plaintiff, Trisha and I] are so elated to have her as part of our extended family," and they have "made us the happiest family on earth." Pictures were then included of the birth announcement, Plaintiff holding [Raven] and Defendant and [Raven].
 

 ....
 

 *40
 
 43. Plaintiff is not listed as a parent on the child's Birth Certificate.
 

 44. The Plaintiff was present during Defendant's labor at Rex Hospital....
 

 45. The Plaintiff was identified as "co parent" to [Raven] by the hospital and Defendant did not dispute the identification.
 

 46. The Defendant identified Plaintiff on her General Consent to admission when being admitted for delivery and identified her as "life partner".
 

 47. Upon birth, Plaintiff was excluded so Defendant could bond with the child without Plaintiff present.
 

 48. After the birth of [Raven], Defendant made postings on social media with pictures of Plaintiff, [Raven and Trisha], referring to them as her family.
 

 49. The Plaintiff knew of a nanny for [Raven] through a classmate of [Trisha's] and the parties met with and interviewed Angela Lopez together for the position. Angela Lopes [sic] was hired as [Raven's] nanny and served in the capacity until late December of 2014.
 

 50. [Raven's nanny] was under the belief that both parties were equally responsible for [Raven].... It was not until after the parties broke up in October that Defendant approached her and asked that she communicate with her directly.
 

 51. Subsequent to [Raven]'s birth, the Plaintiff was not held out as [Raven]'s parent and the Defendant did not cede decision making authority.
 

 52. The Plaintiff did not create a permanent parent-like relationship with the minor child, only a "significant loving, adult care taker" relationship, not that of a parent.
 

 53. No steps were made by the parties to make the family unit permanent. The parties were not married in this or any other state.
 

 54. After the birth of [Raven], Plaintiff and Defendant discussed that should Plaintiff pass away, Defendant would care for [Raven and Trisha]. Should Defendant pass away,
 
 *41
 
 Plaintiff would care for [Raven and Trisha] and should both parties pass away leaving behind their children, the Defendant's sister, Judy, would care for both [Raven and Trisha].
 

 55. Defendant paid for daycare costs exclusively from her own funds from the birth of the child until the parties separated.
 

 56. Other than [Raven's] daycare costs incurred by Defendant and [Trisha's] afterschool
 
 *382
 
 costs incurred by Plaintiff, the parties equally contributed to the household finances.
 

 57. Defendant insisted on providing care and bonding with her child when she was home, to the exclusion of Plaintiff.
 

 ....
 

 59. After the parties ended their romantic relationship, the Defendant placed [Raven] in a daycare facility and listed Plaintiff as an emergency contact until January 9, 2015. Defendant did give access to her sisters.
 

 60. Plaintiff was not involved in the preparation of the child's baptism, though she did provide [Trisha's] baptism gown for [Raven]. While the Plaintiff was in attendance, she was not a part of the ceremony.
 

 ....
 

 62. Defendant selected [Raven's] pediatrician and made all decisions for daycare, medical care and pediatrician choices. The Plaintiff attended at least one well-baby visit and took [Raven] to the doctor with Defendant, when she was sick. Plaintiff was listed as an emergency contact on the pediatrician records and "Partner" as relationship to Defendant.
 

 63. During the relationship Defendant was the primary caretaker for [Raven].
 

 64. [Raven] and [Trisha] had a special and loving bond as sisters and were close to each other.
 

 65. Both parties contributed to the household expenses.
 

 *42
 
 ....
 

 68. One of the reasons for the break-up was Defendant's insistence upon being the primary parent to the child....
 

 69. After separation the Plaintiff mailed monthly checks for $300 to the Defendant for "Child Support" which were never cashed by the Defendant and were mailed back to the Plaintiff.
 

 70. Defendant did not allow Plaintiff visitation after both parties separated, nor was there any mention of a visitation schedule for the Plaintiff to see the child at the time of separation.
 

 71. The Defendant took no steps to make the Plaintiff the caregiver of the child, should the Defendant predecease the child.
 

 72. On March 6
 
 th
 
 , 2015, the Defendant sent Plaintiff a text stating that since Plaintiff "threatened to sue for visitation" she could never let her take her daughter without her being present.
 

 73. After March, 2015, the Defendant's intent was that the Plaintiff no longer be involved in the child's upbringing.
 

 74. While prior to the birth, the Defendant intended for the parties to equally participate in the care for [Raven], at the time of her birth, Defendant's intentions changed.
 

 75. Prior to the child's birth, the parties planned together for the minor child.
 

 76. At all times relevant to custody, however, that is, at all times after the birth of the child, the Defendant demonstrated her desire to be the child's sole parent.
 

 77. The Court finds that there was no voluntary creation of a family unit, or a permanent parent-like relationship; nor does the Court find that the Defendant ceded her parental authority to the Plaintiff for any manner.
 

 The trial court then concluded:
 

 1. The parties are properly before the Court, and the Court has jurisdiction over the subject matter, custody, of this action and has personal jurisdiction of the parties to this action.
 

 *43
 
 2. However, Plaintiff does not have standing to raise this matter, and it should be dismissed pursuant to Rule 12(b)(1). Similarly, since she has failed to establish her standing to raise the matter, she has failed to state a claim upon which relief can be granted.
 

 ....
 

 6. Despite some isolated instances of Defendant acknowledging Plaintiff as a parent to [Raven], following the birth of the minor child, the Defendant did not cede parental authority to the Plaintiff.
 

 7. The Plaintiff was a loving caretaker for the minor child, had a substantial relationship with [Raven], but was not intended by Defendant to be a parental figure.
 

 ....
 

 *383
 
 9. There were no acts inconsistent with the Defendant's parental rights, such as to grant Plaintiff the right to claim third party custody.
 

 Plaintiff timely filed her notice of appeal to this Court.
 

 Discussion
 

 On appeal, plaintiff raises several issues, beginning with whether plaintiff has standing to maintain an action for child custody and the trial court erred in dismissing her complaint.
 

 I. Preliminary matters
 

 Before we address the substantive issues raised by plaintiff, we note the trial court's order does not indicate the standard of proof for any of its findings of fact, nor does the transcript assist us in determining if the trial court relied upon clear, cogent and convincing evidence for any of the findings. Neither party has raised this issue on appeal, but since it is integral to the jurisdictional determination and since we are remanding this case for further proceedings, we note that on remand the trial court must be clear that it is applying the "clear, cogent, and convincing" standard. "[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence."
 
 Adams v. Tessener
 
 ,
 
 354 N.C. 57
 
 , 63,
 
 550 S.E.2d 499
 
 , 503 (2001).
 
 See also
 

 Heatzig v. MacLean
 
 ,
 
 191 N.C. App. 451
 
 , 460,
 
 664 S.E.2d 347
 
 , 354 (2008) ("The evidence required to show that a parent has acted inconsistently with her constitutionally
 
 *44
 
 protected parental status must be clear, cogent and convincing."). Of course, we realize that here, the trial court concluded that defendant's conduct was
 
 not
 
 inconsistent with her protected status as a parent. But the difficulty in reviewing this order comes in part from the fact that the findings the trial court made-if made by clear, cogent, and convincing evidence-do not support the trial court's conclusion. On remand, the trial court shall make findings based upon this standard of proof and should affirmatively state the standard of proof in the order on remand.
 

 In our analysis below, we will therefore review
 
 de novo
 
 the trial court's conclusion on lack of subject matter jurisdiction based upon the uncontested findings of fact, while recognizing that
 
 if
 
 those findings were not based upon the proper standard of proof, the findings would not be sufficient as a matter of law to show that defendant's actions were "inconsistent with his or her protected status" and could not support plaintiff's standing. And although there is no affirmative statement of the standard in the order, we also have no reason to believe that the trial court failed to use the correct standard of clear, cogent, and convincing evidence for the findings. As a practical matter, if we remanded only for the trial court to state the standard it actually used in this order, thus requiring another appeal from the revised order, we would delay a final disposition of this custody matter for a long time, and that delay would not be in the best interest of the child. We will thus review the conclusions of law based upon the findings as they stand and as if they were based upon clear, cogent, and convincing evidence.
 

 II. Standing to Maintain Action for Child Custody
 

 Plaintiff argues the trial court erred by concluding that she did not have standing to bring a custody claim and dismissing her complaint under Rule 12(b)(1). We first note that the order makes contradictory conclusions of law on subject matter jurisdiction, since standing
 
 is
 
 an issue of subject matter jurisdiction:
 

 Based upon the foregoing findings of fact and upon the stipulation of the parties in open court, the court CONCLUDES AS A MATTER OF LAW:
 

 1. The parties are properly before the Court, and the Court has
 
 jurisdiction over the subject matter
 
 , custody, of this action and has personal jurisdiction of the parties to this action.
 

 2. However,
 
 Plaintiff does not have standing to raise this matter, and it should be dismissed pursuant to Rule 12(b)(1).
 
 Similarly, since she has failed to establish her
 
 *45
 
 standing to raise the matter, she has failed
 
 *384
 
 to state a claim upon which relief can be granted.
 

 (Emphasis added).
 

 Subject matter jurisdiction is
 
 the
 
 basis for motions under Rule 12(b)(1): "Standing concerns the trial court's subject matter jurisdiction and is therefore properly challenged by a Rule 12(b)(1) motion to dismiss. Our review of an order granting a Rule 12(b)(1) motion to dismiss is
 
 de novo
 
 ."
 
 Fuller v. Easley
 
 ,
 
 145 N.C. App. 391
 
 , 395,
 
 553 S.E.2d 43
 
 , 46 (2001) (citations omitted).
 
 See also
 

 Aubin v. Susi
 
 ,
 
 149 N.C. App. 320
 
 , 324,
 
 560 S.E.2d 875
 
 , 878-79 (2002) ("Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction. Therefore, issues pertaining to standing may be raised for the first time on appeal, including
 
 sua sponte
 
 by the Court." (Citations omitted)).
 

 Although the trial court first concluded that it had jurisdiction over the "subject matter, custody," it then concluded that "[p]laintiff does not have standing to raise this matter, and it should be dismissed pursuant to Rule 12(b)(1)." But in any event, we review standing
 
 de novo
 
 , so we may resolve this contradiction based upon the trial court's findings of fact.
 
 See
 

 Fuller
 
 ,
 
 145 N.C. App. at 395
 
 ,
 
 553 S.E.2d at 46
 
 ("Our review of an order granting a Rule 12(b)(1) motion to dismiss is
 
 de novo
 
 ." (Citation omitted)).
 

 Under
 
 N.C. Gen. Stat. § 50-13.1
 
 (a) (2015), "[a]ny parent, relative, or other person, agency, organization or institution claiming the right to custody of a minor child may institute an action or proceeding for the custody of such child[.]"
 
 See also
 

 Mason v. Dwinnell
 
 ,
 
 190 N.C. App. 209
 
 , 219,
 
 660 S.E.2d 58
 
 , 65 (2008) ("Standing in custody disputes is governed by
 
 N.C. Gen. Stat. § 50-13.1
 
 (a) (2007), which states that any parent, relative, or other person, agency, organization or institution claiming the right to custody of a minor child may institute an action or proceeding for the custody of such child. Nevertheless, as with
 
 N.C. Gen. Stat. § 50-13.2
 
 , our courts have concluded that the federal and state constitutions place limitations on the application of § 50-13.1." (Citation, quotation marks, brackets, and ellipses omitted)).
 

 In
 
 Ellison v. Ramos
 
 ,
 
 130 N.C. App. 389
 
 , 394,
 
 502 S.E.2d 891
 
 , 894 (1998), this Court held "that a relationship in the nature of a parent and child relationship, even in the absence of a biological relationship, will suffice to support a finding of standing." This Court clarified in
 
 Ellison
 
 that
 

 we confine our holding to an adjudication of the facts of the case before us: where a third party and a child have
 
 *46
 
 an established relationship in the nature of a parent-child relationship, the third party does have standing as an "other person" under
 
 N.C. Gen. Stat. § 50-13.1
 
 (a) to seek custody.
 

 Id
 
 . at 395,
 
 502 S.E.2d at 895
 
 .
 
 See also
 

 Smith v. Barbour
 
 ,
 
 154 N.C. App. 402
 
 , 408,
 
 571 S.E.2d 872
 
 , 877 (2002) ("Both parents and third parties have a right to sue for custody. In a custody dispute between a parent and a non-parent, the non-parent must first establish that he has standing, based on a relationship with the child, to bring the action." (Citation omitted)).
 

 In
 
 Mason
 
 , this Court elaborated on
 
 Ellison
 
 further and noted that
 

 despite the statute's broad language, in the context of a third party seeking custody of a child from a natural (biological) parent, our Supreme Court has indicated that there are limits on the "other persons" who can bring such an action. A conclusion otherwise would conflict with the constitutionally-protected paramount right of parents to custody, care, and control of their children.
 

 Mason
 
 ,
 
 190 N.C. App. at 219
 
 ,
 
 660 S.E.2d at 65
 
 (citations and quotation marks omitted). The
 
 Mason
 
 Court found "no serious dispute that Mason established that she had standing under
 
 N.C. Gen. Stat. § 50-13.1
 
 ," where her complaint alleged that she jointly raised the child with her domestic partner Dwinnell, that they signed an agreement acknowledging Mason as a "de facto" parent, that she had formed a parenting relationship with the child, and that the minor child had spent his life with both Mason and Dwinnell providing emotional and financial support and care.
 
 Id
 
 . at 220,
 
 660 S.E.2d at 65
 
 .
 

 This Court has elaborated further on standing in custody disputes, explaining:
 

 *385
 
 As in many custody cases, the struggling of adults over children raises concern regarding the consequences of the rulings for the children involved. Our General Assembly acted on this concern by mandating that disputes over custody be resolved solely by application of the "best interest of the child" standard. Nevertheless, our federal and state constitutions, as construed by the United States and North Carolina Supreme Courts, do not allow this standard to be used as between a legal parent and a third party unless the evidence establishes that the
 
 *47
 
 legal parent acted in a manner inconsistent with his or her constitutionally-protected status as a parent. No litmus test or set of factors can determine whether this standard has been met. Instead, the legal parent's conduct would, of course, need to be viewed on a case-by-case basis[.]
 

 Estroff v. Chatterjee
 
 ,
 
 190 N.C. App. 61
 
 , 63-64,
 
 660 S.E.2d 73
 
 , 75 (2008) (citations, quotation marks, and footnote omitted). Thus, to maintain a claim for custody on this basis, the party seeking custody must allege facts demonstrating a sufficient relationship with the child and then must demonstrate that the parent has acted in a manner inconsistent with his or her protected status as a parent.
 
 See, e.g.,
 

 Heatzig
 
 ,
 
 191 N.C. App. at 454
 
 ,
 
 664 S.E.2d at 350
 
 ("If a legal parent (biological or adoptive) acts in a manner inconsistent with his or her constitutionally-protected status, the parent may forfeit this paramount status, and the application of the 'best interest of the child' standard in a custody dispute with a non-parent would not offend the Due Process Clause.").
 

 This Court also noted in
 
 Heatzig
 
 that "in order to constitute acts inconsistent with a parent's constitutionally protected status, the acts
 
 are not
 
 required to be 'bad acts' that would endanger the children."
 
 Id
 
 . at 455,
 
 664 S.E.2d at 351
 
 . Similarly, in
 
 Boseman v. Jarrell
 
 , our Supreme Court explained:
 

 A parent loses this paramount interest [in the custody of his or her children] if he or she is found to be unfit or acts inconsistently with his or her constitutionally protected status. However, there is no bright line beyond which a parent's conduct meets this standard.... [C]onduct rising to the statutory level warranting termination of parental rights is unnecessary. Rather, unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct can also rise to this level so as to be inconsistent with the protected status of natural parents.
 

 Boseman v. Jarrell
 
 ,
 
 364 N.C. 537
 
 , 549-50,
 
 704 S.E.2d 494
 
 , 503 (2010) (citations, quotation marks, brackets, and ellipses omitted).
 

 Turning to the order on appeal, the trial court's uncontested findings of fact-which we are treating as being based upon clear, cogent, and convincing evidence as discussed above-show that plaintiff and defendant were in a committed relationship and jointly decided to have a child and to raise that child together. They continued to live together as a family unit until their relationship ended, when Raven was about
 
 *48
 
 20 months old. When their relationship deteriorated and they ultimately separated, defendant changed her intentions, but she had participated in creating a family unit which included plaintiff. For example, as the trial court found, Raven's relationship with Trisha, plaintiff's child, was "a special and loving bond as sisters[.]"
 

 The trial court's findings of fact are to some extent contradictory. For example, the court found that "[s]ubsequent to [Raven]'s birth, the Plaintiff was not held out as [Raven]'s parent...." But the trial court also made findings of fact of instances of plaintiff being held out as a parent. Specifically, the trial court found that defendant gave plaintiff a Mother's Day card "addressed to 'Leemo' on [Raven's] behalf"; that defendant had "assured Plaintiff after they separated that she would continue to see [Raven] as she was her 'mama too' "; that "Defendant sent an email to Carolina Conceptions thanking them on behalf of Lee, Big Sister [Trisha] and Baby [Raven]. She states, 'Lee, [Trisha] and I are so elated to have her as part of our extended family,' and they have 'made us the happiest family on earth.' "; and that the parties had discussed that the survivor would care for both children upon the death of either party.
 

 Plaintiff also argues that the trial court erred in failing to consider facts and circumstances
 
 *386
 
 preceding Raven's birth. We agree. Specifically, the trial court found that "[a]t all times relevant to custody, however, that is, at all times
 
 after the birth of the child
 
 , the Defendant demonstrated her desire to be the child's sole parent." (Emphasis added). The trial court based its conclusion that plaintiff had no standing upon its finding that defendant changed her intention to co-parent with plaintiff immediately after Raven's birth, despite her former intention to create a joint family, as shown during the parties' extensive efforts to conceive and preparation for Raven's birth. Even setting aside the fact that other findings tend to indicate that defendant continued to have the intention to co-parent with plaintiff at least until the parties' separation, the trial court's findings state it
 
 did not consider
 
 the parties' actions prior to Raven's birth because they were not "relevant" to this inquiry on intent. But defendant's actions prior to the child's birth are relevant to determining her intention.
 

 Although the events prior to birth alone are not controlling, they must be considered along with actions after the child's birth. All of North Carolina's prior cases addressing similar same-sex partners who had a child and then separated have discussed the parties' actions in planning and preparing for their family even before the child's conception and birth.
 
 See, e.g.
 
 ,
 
 Estroff
 
 , 190 N.C. App. at 69, 660 S.E.2d at 78 ("[I]t is appropriate to consider the legal parent's intentions regarding
 
 *49
 
 the relationship between his or her child and the third party during the time that relationship was being formed and perpetuated.").
 
 See also
 

 Davis v. Swan
 
 ,
 
 206 N.C. App. 521
 
 , 528,
 
 697 S.E.2d 473
 
 , 478 (2010) ("Here, the trial court made numerous findings of fact, which are unchallenged on appeal, that demonstrate Swan's intent jointly to create a family with [her former domestic partner] Davis and intentionally to identify her as a parent of the minor child.").
 

 Although the specific facts of each case are unique, prior cases have addressed the parties' actions leading up to the inception of the custody dispute, including actions before a child's birth, as relevant to determining this intention. These cases naturally involve same-sex couples, so each couple had to decide who would carry the child and how the child would be conceived. For example, in
 
 Boseman
 
 , our Supreme Court noted the parties' actions prior to the child's birth:
 

 The record in the case
 
 sub judice
 
 indicates that defendant intentionally and voluntarily created a family unit in which plaintiff was intended to act-and acted-as a parent. The
 
 parties jointly decided to bring a child into
 

 their relationship, worked together to conceive a child,
 
 chose the child's first name together, and gave the child a last name that "is a hyphenated name composed of both parties' last names." The parties also publicly held themselves out as the child's parents at a baptismal ceremony and to their respective families. The record also contains ample evidence that defendant allowed plaintiff and the minor child to develop a parental relationship. Defendant even "agrees that [plaintiff] ... is and has been a good parent."
 

 Boseman
 
 ,
 
 364 N.C. at 552
 
 ,
 
 704 S.E.2d at 504
 
 (emphasis added).
 

 It is true that in
 
 Boseman
 
 , the parties took additional actions to make the parental relationship between the plaintiff and the child permanent, since the parties jointly participated in an adoption proceeding so the defendant would become the child's legal parent.
 
 Id
 
 . at 540,
 
 704 S.E.2d at 497
 
 . That adoption was vacated in
 
 Boseman
 
 , but the underlying custody action remained.
 

 Id.
 

 at 553
 
 ,
 
 704 S.E.2d at 505
 
 . But if the parties' actions prior to the child's birth in
 
 Boseman
 
 were irrelevant, the Supreme Court would not have noted these actions. These facts are part of the relevant inquiry, along with the parties' actions after the child is born.
 

 In all of these cases, whether months or years after the child's birth, the parties became estranged, and either during the time immediately
 
 *50
 
 preceding the estrangement or at that time, the biological parent's intentions as to the former partner changed and she denied her partner access to the child. The birth parent
 
 changed
 
 her intentions in every case, but her intention at that point is not controlling. The issue is whether, before the end of the relationship, she had the intent to create that relationship with the partner and
 
 *387
 
 whether she overtly did so, leading both the child and others to believe that the partner was in a parental role. Our Court has noted that the trial court should focus on the parties' actions and intentions
 
 prior
 
 to their estrangement, and may include the time prior to the child's birth:
 

 [T]he court's focus must be on whether the legal parent has voluntarily chosen to create a family unit and to cede to the third party a sufficiently significant amount of parental responsibility and decision-making authority to create a permanent parent-like relationship with his or her child. The parent's intentions regarding that relationship are necessarily relevant to that inquiry. By looking at both the legal parent's conduct and his or her intentions, we ensure that the situation is not one in which the third party has assumed a parent-like status on his or her own without that being the goal of the legal parent.
 

 ....
 

 We agree with the New Jersey Supreme Court that the focus must, however, be on the legal parent's intent during the formation and pendency of the parent-child relationship between the third party and the child.
 
 Intentions after the ending of the relationship between the parties are not relevant because the right of the legal parent does not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the party's separation she regretted having done so.
 

 Estroff
 
 , 190 N.C. App. at 70-71, 660 S.E.2d at 78-79 (citations, quotation marks, and brackets omitted) (emphasis added).
 

 Estroff
 
 indicates that the actions and intentions during the relationship of the parties, during the planning of the family, and before the estrangement carry more weight than those at the end of the relationship, since the court noted that "[i]ntentions after the ending of the relationship between the parties are not relevant because the right of the legal parent does not extend to erasing a relationship between
 
 *51
 
 her partner and her child which she voluntarily created and actively fostered simply because after the party's separation she regretted having done so."
 
 Id
 
 . at 70-71, 660 S.E.2d at 79 (citation, quotation marks, and brackets omitted).
 
 See also
 

 Davis
 
 ,
 
 206 N.C. App. at 526
 
 ,
 
 697 S.E.2d at 477
 
 ("Also, the trial court must consider the intent of the legal parent, in addition to her conduct.").
 

 Here, by finding that the parties' actions and intentions prior to Raven's birth were
 
 not
 
 relevant, the trial court failed to consider all of the factors which show "intent during the formation and pendency of the parent-child relationship between the third party and the child."
 
 Id
 
 . at 70, 660 S.E.2d at 79 (citation and quotation marks omitted). Instead, the trial court focused more on the defendant's change of intention upon the ending of the relationship, which is "not relevant because the right of the legal parent does not extend to erasing a relationship between her partner and her child which she voluntarily created[.]"
 
 Id
 
 . at 70-71, 660 S.E.2d at 79 (citation, quotation marks, and brackets omitted). To the contrary, the facts as to the parties' planning of Raven's birth and clearly stated intentions, particularly in relation to the process through Carolina Conceptions and at the hospital, tend to show the intent to form a family unit, with defendant as a co-parent. Had the parties separated immediately upon Raven's birth, these actions prior to birth would not alone establish standing for defendant's custody claim, since defendant and Raven would never have formed a relationship, but that is not this case. Living together as a family for over a year would demonstrate a continuing intention, even though defendant's intentions later changed.
 

 The trial court also focused on other facts with limited relevance to the proper legal conclusion. For example, the trial court found that the parties did not take "steps ... to make the family unit permanent":
 

 52. The Plaintiff did not create a permanent parent-like relationship with the minor child, only a "significant loving, adult care taker" relationship, not that of a parent.
 

 53. No steps were made by the parties to make the family unit permanent. The parties were not married in this or any other state.
 

 *388
 
 Marriage was not an available option for these parties in North Carolina prior to their relationship ending in October 2014.
 
 [3]
 
 Other states
 
 *52
 
 recognized same-sex marriages earlier, but marriage of the parties still would not change the legal relationship between plaintiff and Raven. Heterosexual couples often marry after one party has had a child from a previous relationship, but the legal marriage itself does not give the step-parent any claim to parental rights in relation to the child.
 
 See, e.g.,
 

 Moyer v. Moyer
 
 ,
 
 122 N.C. App. 723
 
 , 724-25,
 
 471 S.E.2d 676
 
 , 678 (1996) ("At common law, the relationship between stepparent and stepchild does not of itself confer any rights or impose any duties upon either party. In contrast, if a stepfather voluntarily takes the child into his home or under his care in such a manner that he places himself
 
 in loco parentis
 
 to the child, he assumes a parental obligation to support the child which continues as long as the relationship lasts.... However, the fact that a stepfather is
 
 in loco parentis
 
 to a minor child during marriage to the child's mother does not create a legal duty to continue support of the child after the marriage has been terminated either by death or divorce." (Citations omitted));
 
 Duffey v. Duffey
 
 ,
 
 113 N.C. App. 382
 
 , 387,
 
 438 S.E.2d 445
 
 , 448-49 (1994) ("If we are to impose the same obligations and duties on a stepparent, then it is only fair to confer the same rights and privileges, such as visitation and custody, to a stepparent. However, to do so would necessarily interfere with a child's relationship with his or her noncustodial, natural parent. Clearly this is not what the legislature intended.").
 

 And although both same-sex and heterosexual marriages are intended to be permanent, sometimes they end in divorce, and the divorce of the partners does not change the legal relationship of the partners to their children. This Court has rejected the argument that the legal ability to marry or adopt has "legal significance":
 

 Likewise, we find immaterial Dwinnell's arguments that she and Mason could not marry, and Mason could not adopt the child under North Carolina law. We cannot improve on the Pennsylvania Supreme Court's explanation as to why "the nature of the relationship" has no legal significance to the issues of custody and visitation: "
 
 The ability to marry the biological parent and the ability to
 

 *53
 

 adopt the subject child have never been and are not now factors in determining whether the third party assumed a parental status and discharged parental duties
 
 . What is relevant, however, is the method by which the third party gained authority to do so."
 

 Mason
 
 , 190 N.C. App. at 218-19, 660 S.E.2d at 64 (citation omitted) (emphasis omitted) (emphasis added). Likewise, the trial court found that plaintiff was "not listed as a parent on the child's Birth Certificate," but it would have been impossible in North Carolina for her to have been listed on the birth certificate when Raven was born in 2013, as same-sex marriage was not yet recognized.
 
 See, e.g.,
 

 Mason
 
 ,
 
 id
 
 . at 211-12, 660 S.E.2d at 60 ("Although Dwinnell's name was the only name listed as a parent on the child's birth certificate, evidence was presented that the parties mutually desired to include both Mason and Dwinnell on the birth certificate, but the hospital refused to do so.").
 

 Here, defendant's actions before Raven's birth-if we assume that the trial court made its findings based upon clear, cogent, and convincing evidence-indicate her intent to create a parental relationship between Raven and plaintiff. The trial court found that both parties signed a contract with Carolina Conceptions which states "that any child resulting from the procedure will be their legitimate child in all aspects" and identifies the parties collectively as "Recipient Couple." The trial court also found that "[p]rior to the pregnancy, the Defendant intended that Plaintiff serve as a parent to [Raven]." The
 
 *389
 
 court's order contains numerous other findings noting plaintiff's bond with Raven and emails and other correspondence by defendant identifying plaintiff as a mother to Raven and Trisha as Raven's sister. Based upon the uncontested findings and assuming that these findings were based upon clear, cogent, and convincing evidence, the trial court erred in concluding that plaintiff did not have standing to support her claim for custody. In addition, the trial court should have considered the facts preceding Raven's birth in making its conclusions and should not have relied upon the facts that the parties were not married, pursued no legal adoption, and did not list plaintiff as a parent on the birth certificate. We therefore vacate the order and remand this matter to the trial court for further proceedings consistent with this opinion.
 

 III. Limitation of time for hearing
 

 Although we have determined that we must vacate and remand the trial court's order, we will discuss plaintiff's remaining issue as it may be relevant for the trial court's consideration of the issues on remand.
 

 *54
 
 Plaintiff argues that the trial court abused its discretion in terminating plaintiff's testimony and limiting plaintiff's evidentiary presentation to one hour. But plaintiff requested no additional time at the hearing, so she has waived this argument on appeal.
 
 See, e.g.,
 

 Hoover v. Hoover
 
 , --- N.C. App. ----, ----,
 
 788 S.E.2d 615
 
 , 618 (" N.C. R. App. P. Rule 10(a)(1) (2014) provides in relevant part that in order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make and must have obtained a ruling upon the party's request, objection, or motion. As a general rule, the failure to raise an alleged error in the trial court waives the right to raise it for the first time on appeal." (Citations, quotation marks, and brackets omitted)),
 
 disc. review denied
 
 ,
 
 369 N.C. 187
 
 ,
 
 794 S.E.2d 519
 
 (2016).
 

 At the start of the hearing, both the trial judge and plaintiff's attorney noted that the court was setting aside two hours for a temporary custody hearing. No objection was lodged in relation to the time constraint. Plaintiff argues on appeal that the trial court ended up doing much more than determining temporary custody, since the trial court dismissed the action, but the trial court could not address even temporary custody without first determining whether plaintiff had standing to pursue a custody claim. Under the local district court rules for a temporary custody hearing, which defendant filed as a memorandum of additional authority, Rule 7.3 notes that "[t]emporary custody hearings shall be limited to two (2) hours. Each party will have up to one (1) hour to present his or her case, including direct and cross-examination, opening and closing arguments." The rules also state that additional time may be requested by parties "[w]ith written notice to the opposing party at least seven (7) days prior to the scheduled hearing date[.]" Plaintiff did not request additional time under Rule 7.3. We find the trial court did not abuse its discretion by limiting plaintiff's presentation to one hour.
 

 Conclusion
 

 In conclusion, we must vacate the trial court's order dismissing plaintiff's custody complaint for lack of standing. Because the trial court's order does not properly address or weigh evidence of events before Raven's birth; relies at least in part on matters such as the parties' failure to marry; and does not indicate that the proper standard of clear, cogent, and convincing evidence was used, we vacate the trial court's order and remand to the court for further proceedings consistent with this opinion. Specifically, the trial court should enter a new order addressing the jurisdictional issue containing findings of fact based
 
 *55
 
 upon clear, cogent and convincing evidence. Depending upon that order, if the custody claims remain to be determined, the trial court shall allow the parties to present evidence at another hearing.
 

 VACATED AND REMANDED.
 

 Judges HUNTER, Jr. and DAVIS concur.
 

 [1]
 

 We use pseudonyms throughout to protect the identity of the minor children.
 

 [2]
 

 This appears to be a typo in the trial court's order, as the previous finding and the hearing transcript indicate that plaintiff's check was for $5,575.00, not $5,757.00. We also note that findings 21 and 22 are not findings of fact but are recitations of each party's contentions regarding a disputed fact.
 

 [3]
 

 Nor would adoption have been an option.
 
 See
 

 Boseman
 
 ,
 
 364 N.C. at 546
 
 ,
 
 704 S.E.2d at 501
 
 (finding adoption decree void and plaintiff [former same-sex partner of defendant] not legally recognizable as the minor child's parent where "[p]laintiff was not seeking an adoption available under Chapter 48. In her petition for adoption, plaintiff explained to the adoption court that she sought an adoption decree that would establish the legal relationship of parent and child with the minor child, but not sever that same relationship between defendant and the minor child. As we have established, such relief does not exist under Chapter 48." (Citations omitted)).