IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-494

Filed 19 March 2024

Mecklenburg County, No. 18CVD17655

TRICOSA GREEN, Plaintiff,

v.

E'TONYA CARTER, Defendant.

Appeal by plaintiff from order entered 3 November 2021 by Judge J. Rex Marvel in District Court, Mecklenburg County. Heard in the Court of Appeals 11 April 2023.

*Wofford Law, PLLC, by J. Huntington Wofford and Rebecca B. Wofford, for plaintiff-appellant.*

*Collins Family Law Group, by Rebecca K. Watts, for defendant-appellee.*

STROUD, Judge.

This case raises the issue of whether Plaintiff, who is not the child's parent but who is a person acting as a parent, can be required to pay child support under North Carolina General Statute Section 50-13.4(b). Based on long-established North Carolina law, the short answer is no: Plaintiff cannot be required to pay child support unless she is the child's mother or father *or* she agreed formally, in writing, to pay child support.

The long answer requires us to interpret North Carolina General Statute Section 50-13.4(b), which governs both primary liability and secondary liability for child support. *See* N.C. Gen. Stat. § 50-13.4(b) (2019). The difference between primary and secondary liability for child support is that a person may be held secondarily liable for child support only if the people who are primarily liable – the child's parents – cannot adequately provide for the child's needs. *See id.* Indeed, North Carolina General Statute Section 50-13.4(b) first establishes that a child's "mother" and "father" have primary liability for child support. *Id.* A "mother" is the female parent of a child, either as a biological parent or as an adoptive parent. Merriam-Webster's Collegiate Dictionary 810 (11th ed. 2005). Similarly, a "father" is the male parent of a child, whether as a biological parent, by adoption, by legitimation, or by adjudication of paternity. *Id.* at 456.

North Carolina General Statute Section 50-13.4(b) also sets out who can have secondary liability for child support: "any other person, agency, organization or institution standing in *loco parentis*." N.C. Gen. Stat § 50-13.4(b). "Standing in *loco parentis*" means "in the place of a parent" and "may be defined as one who has assumed the status and obligations of a parent without a formal adoption." *In re A.P.*, 165 N.C. App. 841, 845, 600 S.E.2d 9, 12 (2004) (citations and quotation marks omitted). Further, North Carolina General Statute Section 50-13.4(b) limits secondary liability for child support to a person standing in *loco parentis* only if that

person has "voluntarily assumed the obligation of support in writing." N.C. Gen. Stat. § 50-13.4(b).

Because the parties are women who were previously in a romantic relationship, never married, and share custody of the child equally, the trial court determined that Plaintiff is primarily liable to pay child support, as a "parent," based on a novel "gender neutral" interpretation of North Carolina General Statute Section 50-13.4. But based on the well-established law discussed below, the trial court did not have a legal basis to order Plaintiff to pay child support. Instead of being "gender neutral" in application, the trial court's interpretation of North Carolina General Statute Section 50-13.4(b) created a different result than would have been required under the law if the parties to this case had been a heterosexual couple. North Carolina General Statute Section 50-13.4(b) has the same application to both same-sex unmarried couples who have a child by in vitro fertilization as to unmarried heterosexual couples who have a child by in vitro fertilization if the male partner is not the donor of the sperm; neither can be required to pay child support.

Further, the General Assembly has given instructions in North Carolina General Statute Section 12-3(16) on when a statute may have a gender neutral interpretation, and Section 50-13.4 is not covered by this statute. *See* N.C. Gen. Stat. § 12-3(16) (2019). In addition, Plaintiff also could not be secondarily liable to pay child support because this would violate established precedent addressing child support liability for a person standing in *loco parentis* to a child, regardless of gender.

*See generally* N.C. Gen. Stat. § 50-13.4.  For these reasons, as explained in detail below, we reverse the trial court's order and remand for further proceedings.

## I.    Background

This summary is based on the findings of fact in the trial court's orders as the findings were not challenged on appeal.  *See In re K.W.*, 282 N.C. App. 283, 286, 871 S.E.2d 146, 149 (2022) ("Unchallenged findings of fact are deemed supported by the evidence and are binding on appeal.").  The parties are two women, never married to one another, who were in an "on again off-again" romantic relationship.  During the parties' relationship, they planned to have a child together.  The parties participated in an in vitro fertilization ("IVF") program in the State of New York.  Both parties signed the IVF Agreement in November 2015, jointly selected a sperm donor, and Partner[1] paid for the IVF process.

In November 2016, in the State of Michigan, Mother gave birth to Alisa.[2]  On Alisa's birth certificate, Mother is listed as the child's mother.  Under Michigan law, Partner "could not be listed on the minor child's birth certificate."  The parties jointly selected a name for the child which reflected both of their names.  Partner presented a proposed parenting agreement to Mother, but the parties never signed the

---

[1] In the trial court, Ms. Carter was the plaintiff in the first complaint for child custody, and Ms. Green was the defendant; in the second complaint for child support, the parties' positions were reversed.  The two cases were later consolidated.  We will therefore refer to Plaintiff-appellant as "Partner" and Defendant-appellee as "Mother" in this opinion to avoid confusion.

[2] A pseudonym is used for the minor child.

agreement.

The parties later ended their romantic relationship, and both moved to North Carolina. In September 2018, Partner filed a child custody proceeding in Mecklenburg County against Mother, seeking custody of Alisa. In March 2019, the trial court entered a Temporary Parenting Arrangement Order granting Partner some visitation with Alisa. On 16 September 2019, at the close of the hearing on permanent custody, the trial court announced its ruling in the child custody proceeding granting the parties joint legal and physical custody. The parties immediately began operating under the joint custodial schedule.

On 11 October 2019, after the trial court's mid-September rendition of its ruling in the custody proceeding, Mother filed a "verified complaint for child support; motion to consolidate and attorney's fees[.]" Mother alleged Partner "has acted as and been treated as a parent to [Alisa] since before her birth" and has exercised custodial time with Alisa based on the permanent custody arrangement rendered on 16 September 2019. Mother alleged Partner "(i) is a parent to [Alisa] in the same sense as the heterosexual terms 'Mother' and 'Father' are used, (ii) is standing in loco parentis to [Alisa], and (iii) has voluntarily assumed the obligation of support of [Alisa], in writing." Mother asserted claims for child support under North Carolina General Statute Section 50-13.4 and for attorney's fees. Mother also moved to consolidate the child custody and child support cases, which was allowed.

On or about 24 October 2019, the trial court entered the permanent custody

order granting Partner joint legal and physical custody of Alisa. The permanent custody order includes findings of fact about both parties, their relationship, Alisa's birth, and their current circumstances. The trial court found Partner had been a substantial part of Alisa's life since her birth. The court concluded that Partner and Alisa had a parent-child relationship, and that Mother had "acted in a manner inconsistent with her protected status as a parent and[,]" as such, "ha[d] waived her constitutional right to exclusive care, custody, and control of the minor child based on clear, cogent, and convincing evidence." The trial court then concluded both Partner and Mother were "fit and proper to exercise joint legal custody and share physical custody of [Alisa]." The court set a permanent child custody arrangement granting an equal number of days with each party. The custody order is a final order which was not appealed.

On 2 December 2019, the trial court entered a temporary child support order. The trial court found Partner, as "De Facto Mother[,]" was a parent to Alisa "in the same sense as the heterosexual terms 'Mother' and 'Father' are used" and both parties were "equally liable" for Alisa's support. The trial court ordered Partner to pay Mother $604.21 in monthly child support and to continue paying the health insurance premiums for Alisa; the trial court ordered Mother to continue paying work-related child-care expenses for Alisa. On 16 December 2019, Partner filed an answer to Mother's complaint for child support. Partner identified herself as "Non-Parent" in her answer and denied any liability for child support or attorney's fees.

On 26 March 2021, Partner filed a "Motion to Dismiss, Answer and Motion to Return Child Support." Partner claimed that she was not the "biological or adoptive parent" of Alisa but she was a *de facto* parent, or standing in *loco parentis*, and as such was not liable for child support to Mother under North Carolina law. Partner also moved to vacate the temporary child support order and for Mother to reimburse her for $8,458.94 in child support that she had paid under the temporary support order. Further, Partner moved for dismissal under North Carolina General Statute Section 1A-1, Rule 12(b)(6) for failure to state a claim. The trial court heard Partner's motion to dismiss on 1 June 2021 and entered an order denying Partner's motion to dismiss on 1 September 2021.

On 7 September 2021, the trial court held a hearing on permanent child support. At the close of Mother's evidence, Partner moved again to dismiss the complaint for child support because she, as a non-parent, could not be liable for child support under North Carolina law. The trial court denied Partner's motion without clarification or explanation.

During closing arguments, Partner again argued North Carolina law, "as currently written, does not allow th[e] [trial] [c]ourt to order [Partner] to pay child support." Partner continued, "[e]ven if the law, even if everybody in this courtroom agrees that things aren't as they should be or that the laws haven't caught on yet, this [c]ourt has to apply the laws as written." The trial court ultimately rendered a ruling finding Partner was a "parent" within the meaning of the child support statute

and should be liable for support. The trial court asked the parties to submit more evidence and arguments after the hearing for purposes of calculating Partner's support obligation.

On 3 November 2021, the trial court entered a Permanent Child Support Order ("Support Order"). The Support Order identified Partner as "De Facto Mother" and Mother as "Biological Mother[.]" The trial court found:

> 14. [Partner] is a parent to [Alisa] in the same sense as the heterosexual terms "Mother" and "Father" are used. The court finds it is appropriate to apply those terms in a gender-neutral way.
>
> 15. There exists pleading, proof and circumstances that warrant this court to hold [Mother] and [Partner] equally liable for the support of the minor child. Specifically, by way of example and not limitation, [Partner] has:
>
> > a. allowed her employer-sponsored health insurance to pay for [Mother's] IVF process with the express intention of birthing and raising a child together,
> >
> > b. signed IVF paperwork which equally bound her to the risks and rewards of the IVF process,
> >
> > c. continued to communicate with and to visit [Mother] even as their romantic relationship deteriorated, but before [Alisa] was born,
> >
> > d. held herself out to family, friends, and social media and this Court as [Alisa's] mother,
> >
> > e. took maternity photos with [Mother],
> >
> > f. attended [Alisa's] baby shower as an honored

parent (in matching T Shirts with [Mother]),

g.    moved to Charlotte to be closer to [Alisa] after [Alisa's] birth and the end of [Partner's] relationship with [Mother],

h.    kept [Alisa] for a two-week period while [Mother] traveled for work,

i.    continuously helped to pay for [Alisa's] day care expenses,

j.    continuously provided health insurance for [Alisa]. To do so, [Partner] signed documents claiming the minor child as her dependent and sought reimbursement for certain medical expenses;

k.    continuously provided financial support to [Mother] for the benefit of [Alisa], including cash, diapers, clothes and the like;

l.    filed a lawsuit and signed a complaint for child custody to be granted court ordered custody of [Alisa]. In this complaint, [Partner] refers to herself as a mother and a parent to [Alisa],

m.    has maintained a consistent 50/50 parenting schedule with [Alisa],

n.    has been regularly involved in [Alisa's] medical and educational development by attending doctors' appointments and being involved with her teachers,

o.    [r]eferred to [Alisa] consistently as her child and to herself continuously as [Alisa's] mother.

1.(sic) [Partner] has enthusiastically and voluntarily held herself out as a parent to [Alisa] and has a support

obligation that accompanies her, now court ordered, right to 50/50 custody. The duty of support should accompany the right to custody in cases such as this one.

16. [Partner] owes a duty of support to [Alisa], and [Mother] is entitled to support from [Partner] for the use and benefit of [Alisa], pursuant to N.C.G.S. § 50-13[.4] and Worksheet B of the North Carolina Child Support Guidelines.

The trial court calculated child support using the North Carolina Child Support Guidelines. Based on the findings of fact, the trial court concluded:

4. Both [Mother] and [Partner] are the lawful parents of [Alisa] and owe a duty of support to [Alisa], pursuant to the provisions of N.C.G.S. § 50-13.4.

5. The terms Mother and Father in N.C.G.S. § 50-13.4 should be read to allow for gender neutral application to parent and parent.

The trial court then ordered Partner to pay $246.11 per month in child support and to continue paying Alisa's health insurance premiums. On 2 December 2021, Partner filed a notice of appeal.

## II. Collateral Estoppel

Although Partner's arguments primarily address the trial court's conclusions of law and the interpretation of North Carolina General Statute Section 50-13.4, she first argues the trial court was prevented by collateral estoppel from finding she is a "lawful parent" of Alisa because the permanent custody order referred to her as "Non-parent." Under the collateral estoppel doctrine, "parties and parties in privity with them . . . are precluded from retrying fully litigated issues that were decided in any

prior determination and were necessary to the prior determination." *King v. Grindstaff*, 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973) (citations omitted). "Collateral estoppel is intended to prevent repetitious lawsuits." *Campbell v. Campbell*, 237 N.C. App. 1, 5, 764 S.E.2d 630, 633 (2014) (citations and quotation marks omitted). To successfully assert collateral estoppel, a party must show "that the earlier suit resulted in a final judgment on the merits, that the issue in question was *identical to an issue actually litigated and necessary to the judgment*, and that both [defendant] and [plaintiff] were either parties to the earlier suit or were in privity with parties." *Thomas M. McInnis & Assocs. v. Hall*, 318 N.C. 421, 429, 349 S.E.2d 552, 557 (1986) (emphasis added) (citation omitted).

In this case, the doctrine of collateral estoppel does not apply because the trial court's use of the term "Non-parent" in place of Ms. Green's name or the word "plaintiff" in the custody order was not an adjudication of any fact or issue in that case. Court orders in child custody and child support cases often use descriptive terms to refer to the parties instead of technical legal terms such as "plaintiff" or "defendant." Here, the custody order used the word "Non-parent" to refer to Partner merely for convenience and clarity, just as we have used the terms "Mother" and "Partner" in this opinion. *See, e.g.*, *State v. Gettleman*, 275 N.C. App. 260, 262, n.1, 853 S.E.2d 447, 449, n.1 (2020) (explaining that "[f]or ease of reading and clarity — and consistent with the parties' briefs, the record, and the transcripts of the proceedings below – we refer to Defendant Marc Christian Gettleman, Sr., as 'Big

Marc,' Defendant Marc Christian Gettleman, II, as 'Little Marc,' and Defendant Darlene Rowena Gettleman as 'Darlene.'").

Here, using the terms "Mother" and "Non-parent" made the custody order easier to read and understand, especially as each party was *both* a plaintiff and a defendant in two lawsuits.  While the trial court could have used the parties' names or their titles as "plaintiff" and "defendant," or even nicknames or pseudonyms, the use of those terms in the context of the custody order would not have served as an adjudication of any fact or legal issue for purposes of North Carolina General Statute Section 50-13.4.  *See generally id.*  Accordingly, the trial court's use of the term "Non-parent" in place of Ms. Green's name or the word "Plaintiff" in the custody order does not create a basis for collateral estoppel regarding Partner's potential liability for child support under North Carolina General Statute Section 50-13.4, particularly considering the trial court's "gender neutral" interpretation of these words in the Support Order.

### III.    Primary Liability for Child Support under North Carolina General Statute Section 50-13.4(b)

Partner's second issue on appeal is whether the trial court erred by "entering a child support order requiring a nonparent to be primarily liable for child support to the child's biological parent."  Partner contends North Carolina General Statute Section 50-13.4 does not allow the trial court to interpret or apply the statute in a gender neutral manner to treat Partner as a lawful parent of the minor child who

owes a duty of financial support.

As none of the findings of fact are challenged on appeal, and Partner challenges only the trial court's conclusions of law that "[b]oth [Mother] and [Partner] are the lawful parents of the minor child and owe a duty of support to the minor child, pursuant to the provisions of N.C.G.S. § 50-13.4" and "[t]he terms Mother and Father in N.C.G.S. § 50-13.4 should be read to allow for gender neutral application to parent and parent[,]" *de novo* review is appropriate. *See Schroeder v. City of Wilmington*, 282 N.C. App. 558, 565, 872 S.E.2d 58, 63 (2022) (A "*de novo* standard applies to questions of statutory interpretation."). Meanwhile, Mother acknowledges that "the technical language of the child support statute uses the terms 'mother' and 'father' to refer to the two parents" but contends

> that is simply the language of the statute. The spirit of the statute is that the two people whose actions resulted in the birth of the child are liable for the support of that child and ensuring that the child receives support from her parents is what the statute seeks to accomplish.

Thus, in summary, Mother contends that instead of relying upon the plain language of the statute, we should consider the legislative intent to interpret the statute in a way to ensure there are two parents responsible for child support.

We therefore must first consider the meaning of the words "mother" and "father" in North Carolina General Statute Section 50-13.4. *See* N.C. Gen. Stat. § 50-13.4. These words are not defined by this statute or by any other provision of Chapter

50.[3] N.C. Gen. Stat. § 50 *et seq.* (2019). In addition, Section 50-13.4 also uses the word "parent" and "parents," referring collectively to the "mother" and "father." *See* N.C. Gen. Stat. § 50-13.4. Since the trial court concluded the parties should be considered as "parent and parent" we must consider the meaning of "parent" as well.

In this statute, the words "mother," "father," and "parent" are used as nouns. These words can also be used as verbs or adjectives and can have different meanings depending on context. North Carolina's child support statute uses "mother" and "father" as nouns to describe the people with primary liability for child support for a minor child. *Id.*

Where a statute defines a word, courts must apply that definition. *See Appeal of Clayton-Marcus Co., Inc.,* 286 N.C. 215, 219-20, 210 S.E.2d 199, 203 (1974) ("Where, however, the statute, itself, contains a definition of a word used therein, that definition controls, however contrary to the ordinary meaning of the word it may be. The courts must construe the statute as if that definition had been used in lieu of the word in question." (citation omitted)). But if a word is not defined by the statute, we must "begin with the plain language of the statute[.]" *State v. Rieger,* 267 N.C. App. 647, 649, 833 S.E.2d 699, 701 (2019) ("When examining the plain language

---

[3] As far as we can tell, the definition of "parent" is provided in only two North Carolina General Statutes. *See* N.C. Gen. Stat. § 14-321.2 (2019) (prohibiting unlawful transfer of custody of a minor child and defining "parent" as "a biological parent, adoptive parent, legal guardian, or legal custodian"); s*ee also* N.C. Gen. Stat. § 51-2.2 (2019) ("As used in this article, the terms 'parent,' 'father,' or 'mother' includes one who has become a parent, father or mother, respectively by adoption.").

of a statute, undefined words in a statute must be given their common and ordinary meaning." (citation and quotation marks omitted)).

The trial court's order concluded Mother and Partner should be considered as "parent and parent" by giving a "gender neutral" interpretation to the words "mother and father" under North Carolina General Statute Section 50-13.4. In North Carolina General Statute Section 50-13.4, the words "mother," "father," and "parent" are used as nouns to describe the people with primary liability for child support for a minor child. N.C. Gen. Stat. § 50-13.4. We turn to the ordinary definitions of "mother," "father," and "parent" when used as nouns. *See Surgical Care Affiliates, LLC,* v. *N.C. Indus. Comm'n,* 256 N.C. App. 614, 621, 807 S.E.2d 679, 684 (2017) ("When a statute employs a term without redefining it, the accepted method of determining the word's plain meaning is not to look at how other statutes or regulations have used or defined the term–but to simply consult a dictionary.").

Webster's New Collegiate Dictionary, 8th Edition defines "mother," when used as a noun, and as applicable to this case, as "a female parent." Webster's New Collegiate Dictionary 751 (8th ed. 1977). The same definition for "mother" is given in the Ninth and Eleventh editions of the dictionary. Webster's New Collegiate Dictionary 774 (9th ed. 1985); Merriam-Webster's Collegiate Dictionary 810 (11th ed. 2005). These dictionaries all define "father" as "a man who has begotten a child[.]" Webster's New Collegiate Dictionary 418 (8th ed. 1977); Webster's New Collegiate Dictionary 451-452 (9th ed. 1985); Merriam-Webster's Collegiate Dictionary 456 (11th

ed. 2005). While North Carolina statutes do address legitimation and adjudication of paternity in North Carolina General Statutes Chapter 49, Articles 2 and 3, these statutes address male parents – fathers – and they do not address maternity. N.C. Gen. Stat. § 49-10 *et seq.* (2019) (addressing legitimation); N.C. Gen. Stat. § 49-14 *et seq.* (2019) (addressing adjudication of paternity). Thus, in North Carolina General Statute Section 50-13.4 "mother" is the female parent of a child and "father" is the male parent of a child, either biologically or by adoption or other legal process to establish paternity. N.C. Gen. Stat. § 50-13.4.

In addition, these dictionaries all distinguish "mother," as a female parent, from "father," as a male parent, in the biological sense by their reproductive roles. A "female" is defined as an "individual that bears young or produces eggs as distinguished from one that begets young." Webster's New Collegiate Dictionary 422 (8th ed. 1977); *see also* Oxford English Dictionary 823 (2nd ed. 1989) (defining female as "belonging to the sex which bears offspring"). A "male" is defined as "of, relating to, or being the sex that begets young by performing the fertilizing function in generation and produces relatively small usu[ally] motile gametes (as sperms, spermatozoids, or spermatozoa) by which the eggs of a female are made fertile." Webster's New Collegiate Dictionary 695 (8th ed. 1977); *see also* Oxford English Dictionary 259 (2nd ed. 1989) ("Of or belonging to the sex which begets offspring, or performs the fecundating [or fertilizing] function of generation.").

Further, "mother" and "father" are collectively referred to as "parents" in North

Carolina General Statute Section 50-13.4 and "parent" is defined as "one that begets or brings forth offspring[,]" Webster's New Collegiate Dictionary 833 (8th ed. 1977), or "[a] person who has begotten or borne a child; a father or mother." Oxford English Dictionary 222 (2nd ed. 1989). Thus, a "female parent" is the person who provides the egg (as opposed to the sperm) and/or gestates the child and gives birth to the child. *See id*; Webster's New Collegiate Dictionary 422 (8th ed. 1977); *see also* Oxford English Dictionary 823 (2nd ed. 1989). Our Court has made clear that conferring parental status outside our statutory framework

> [is] without legal authority or precedent. A district court in North Carolina is without authority to confer parental status upon a person who is not the biological parent of a child. The sole means of creating the legal relationship of parent and child is pursuant to the provisions of Chapter 48 of the General Statutes (Adoptions). . . . The trial court's ruling in this case rests solely upon a flawed and non-existent legal theory.

*Heatzig v. MacLean*, 191 N.C. App. 451, 458, 664 S.E.2d 347, 353 (2008) (citations omitted).

Because the language of North Carolina General Statute Section 50-13.4 is "clear and unambiguous[,]" we cannot rely upon the "spirit of the statute" as Mother contends but we "must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." *Boseman v. Jarrell*, 364 N.C. 537, 545, 704 S.E.2d 494, 500 (2010) (citation and quotation marks omitted). Here, Partner is not a biological or adoptive

parent of Alisa. *See generally* N.C. Gen. Stat. §§ 49-10, 49-14, 48-1-106. Further, North Carolina General Statute Section 50-13.4(b) establishes that a "mother" and "father" share the primary liability for child support. *See* N.C. Gen. Stat. § 50-13.4(b).

**A. Legal Basis for a Gender Neutral Application of the Terms "Mother" and "Father" used in North Carolina General Statute Section 50-13.4.**

Despite the plain meanings of the terms "mother," "father," and "parent," the trial court's order relied on a "gender neutral" application of these words to conclude Partner should be held primarily liable for child support. The trial court concluded North Carolina General Statute Section 50-13.4 "should be read to allow for gender neutral application to parent and parent." The court based this conclusion primarily on four findings:

> 14. [Partner] is a parent to [Alisa] in the same sense as the heterosexual terms "Mother" and "Father" are used. The court finds it is appropriate to apply those terms in a gender-neutral way.
>
> 15. There exists pleading, proof and circumstances that warrant this court to hold [Mother] and [Partner] equally liable for the support of [Alisa].
>
> . . . .
>
> 1. (sic) [Partner] has enthusiastically and voluntarily held herself out as a parent to [Alisa] and has a support obligation that accompanies her, now court ordered, right to 50/50 custody. The duty of support should accompany the right to custody in cases such as this one.
>
> 16. [Partner] owes a duty of support to [Alisa], and [Mother] is entitled to support from [Partner] for the use and benefit of [Alisa], pursuant to N.C.G.S. § 50-13[.]

Thus, the trial court recognized that Section 50-13.4 uses the terms "mother" and "father" but concluded a gender neutral application was "appropriate" based on (1) Partner's actions in holding herself out as a parent and (2) Partner's custodial rights. But there is no legal basis for holding a person *primarily* responsible for child support based only on custodial rights or standing in *loco parentis* to a child. If Partner had been a male in a romantic relationship with Mother, and they had a child by IVF with donor sperm, the male partner may stand in *loco parentis* to the child, but he would not be the "father" of the child as this word is used in North Carolina General Statute Section 50-13.4. *See* N.C. Gen. Stat. § 50-13.4. At best, standing in *loco parentis* may support secondary liability for child support, as we will discuss below. *See id.*

Mother contends Partner, as a "de facto" mother, should be considered as a "mother" as this term is used in North Carolina General Statute Section 50-13.4. Mother notes that Partner

> argues that [Mother] is [Alisa's] mother, that there is no father, and that the statute can only be read as involving one mother and one father – i.e., that it cannot be read as gender-neutral and applying to situations involving two parents who happen to be of the same gender. (See Appellant's brief, p 18) [Mother] disagrees. You do not need to read this statute as specifically applying to same-sex couples to determine that [Partner] is responsible for the support of the minor child. This statute expressly provides that the mother of a minor child is responsible for that child's support. [Mother] is the biological mother, so, yes, she is liable for support. [Partner] is also the mother – she has been found by the trial court to be a de facto parent – a second mother. As such, [Partner] fits within the definition of persons responsible for providing support for .

. . [Alisa].

But Mother cites no legal authority for this argument, and we can find no such authority. As discussed above, Partner is not a "mother" of the child based on the plain meaning of the word. N.C. Gen. Stat. § 50-13.4. Mother also argues "[t]he intent of the statute requires a gender-neutral reading of the terms 'mother' and 'father.' A gender-based reading of this statute would be unconstitutional." In support of this argument, Mother cites only *M.E. v. T.J.*, 275 N.C. App. 528, 538, 854 S.E.2d 74, 89 (2020), *aff'd as modified*, 380 N.C. 539, 869 S.E.2d 624.

In *M.E.*, this Court addressed an entirely different statute, North Carolina General Statute Section 50B-1(b)(6), regarding domestic violence protective orders ("DVPO"). *See id.* at 531, 854 S.E.2d at 84-85. This Court stated that "our analysis is limited to a *de novo* review of whether Plaintiff was unconstitutionally denied a DVPO under N.C.G.S. § 50B-1(b)(6) *solely based on the fact that Plaintiff is a woman* and *Defendant is also a woman.*" *Id.* at 538, 854 S.E.2d at 89. (emphasis in original). Mother's brief does not cite any provisions of the North Carolina or United States Constitutions and makes no substantive constitutional argument based on *M.E.*

Mother argues only that the "underlying principles behind the gender-neutral reading" of the statute regarding domestic violence should also be applied to North Carolina General Statute Section 50-13.4. But even if a "gender neutral" interpretation would allow for Partner to be treated differently than a male in the same situation – and it does not – a "gender neutral" interpretation is not available

for North Carolina General Statute Section 50-13.4. The General Assembly has amended the North Carolina General Statutes to mandate the terms "husband" and "wife," unlike the terms "mother" and "father," be construed in gender-neutral terms. N.C. Gen. Stat. § 12-3(16) (2019).

Shortly after the Supreme Court's opinion in *Obergefell v. Hodges*, 576 U.S. 644 (2015) held the right to marriage is a fundamental constitutional right for same-sex couples, the General Assembly added subsection 16 in North Carolina General Statute Section 12-3(16), titled "Rules for construction of statutes." It states:

> In the construction of all statutes the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the General Assembly, or repugnant to the context of the same statute, that is to say:
>
>  . . . .
>
> (16) "Husband and Wife" and similar terms.--The words "husband and wife," "wife and husband," "man and wife," "woman and husband," "husband or wife," "wife or husband," "man or wife," "woman or husband," or other terms suggesting two individuals who are then lawfully married to each other shall be construed to include any two individuals who are then lawfully married to each other.

N.C. Gen. Stat. § 12-3(16) (effective July 12, 2017).

North Carolina General Statute Section 12-3(16) does not apply to this case because the parties were never married to one another. *See id.* The words "mother" and "father," as well as the related legal rights and obligations, differ from "husband"

and "wife." *See id.*; *see generally* N.C. Gen. Stat. Chapter 50 (using "husband" and "wife" and "mother" and "father" in separate Sections of the Chapter). Since the General Assembly has specifically addressed the instances where a gender neutral interpretation may be used, this Court is not free to give the words "mother" and "father" in North Carolina General Statute Section 50-13.4 a gender neutral meaning or application. *See Boseman*, 364 N.C. at 545, 704 S.E.2d at 500. Mother's interpretation would re-write North Carolina General Statute Section 50-13.4, and only the General Assembly has the authority to re-write the statute. *See State v. J.C.*, 372 N.C. 203, 208, 827 S.E.2d 280, 283 (2019) ("It is not the province of the courts to rewrite statutes absent some constitutional defect or conflict with federal law." (citation omitted)).

Further, another section of North Carolina General Statute Section 12-3 addresses gender in construction of statutes:

> (1) Singular and Plural Number, Masculine Gender, etc.--
> Every word importing the singular number only shall extend and be applied to several persons or things, as well as to one person or thing; and every word importing the plural number only shall extend and be applied to one person or thing, as well as to several persons or things; and *every word importing the masculine gender only shall extend and be applied to females as well as to males, unless the context clearly shows to the contrary.*

N.C. Gen. Stat. § 12-3(1) (emphasis added). North Carolina General Statute Section 12-3(1) would allow construction of a statute using the pronoun "his" to include "hers" unless "the context [of the statute] clearly shows to the contrary." *Id.*

The North Carolina General Statutes are replete with uses of the pronoun "his" or "he," but most statutes using these terms are clearly not referring only to males; they are referring to persons, either natural or corporate. *See, e.g.*, N.C. Gen. Stat. § 1A-1, 15(a) (2019). For example, North Carolina Rules of Civil Procedure 15(a) provides,

> A party may amend *his* pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, *he* may so amend it at any time within 30 days after it is served.

*Id.* (emphasis added). In North Carolina Rule of Civil Procedure 15(a), the words "his" and "he" refer back to a "party" who has filed a pleading, and these may clearly be read as "her" and "she" or even "its" and "it." *Id.* The gender of the party is entirely irrelevant for purposes of a procedural rule about amending pleadings. *See generally id.* Indeed, a "party" to a case may even be a city or town, or a corporation or other corporate entity with no sex or gender. *See, e.g.,* N.C. Gen. Stat. § 1A-1, Rule 4 (2019) (setting out manner of service of process for all types of "parties," including "natural persons" as well as the State, Agencies of the State, and various corporate entities). But in North Carolina General Statute Section 50-13.4, "the context clearly shows to the contrary" of a gender neutral interpretation. *See* N.C. Gen. Stat. §§ 12-3(1), 50-13.4. As used in North Carolina General Statute Section 50-13.4, the word "mother" is, by definition, female and the word "father" is, by definition, male. *See* N.C. Gen.

Stat. § 50-13.4. The trial court, therefore, erred in giving North Carolina General Statute Section 50-13.4 a "gender neutral" interpretation to impose primary liability for child support upon Partner.

### IV. Secondary Liability for Child Support Based on the Status of Standing in *Loco Parentis*

Both parties make arguments in the alternative regarding secondary liability for child support based on Partner's standing in *loco parentis* to Alisa. "This Court has defined a person *in loco parentis* as one who has assumed the status and obligations of a parent without formal adoption." *See Moyer v. Moyer*, 122 N.C. App. 723, 724, 471 S.E.2d 676, 678 (1996) (citation and quotation marks omitted). Partner asserts she is not Alisa's mother but stands in *loco parentis* to Alisa so she could, at most, only be secondarily liable for child support. But Partner also asserts the requirements for secondary liability under Section 50-13.4(b) are not met. Mother asserts Partner may be secondarily liable for child support because she assumed a voluntary obligation to support Alisa but admits "[c]ounsel has not been able to locate case law that addresses what is required for this voluntary assumption to be in writing in a case involving two people who were not married to each other." Mother also identifies no writing in which Partner assumed a child support obligation for Alisa.

It is undisputed that Partner stands in *loco parentis* to Alisa. The trial court addressed Partner's status as in *loco parentis* to Alisa in the custody order as well as

the Support Order on appeal. North Carolina General Statute Section 50-13.4(b)

addresses when "any other person" standing in *loco parentis* may have secondary

liability for child support:

> In the absence of pleading and proof that the circumstances
> otherwise warrant, *any other person*, agency, organization
> or institution *standing in loco parentis shall be secondarily
> liable for such support.* Such other circumstances may
> include, but shall not be limited to, the relative ability of
> all the above-mentioned parties to provide support or the
> inability of one or more of them to provide support, and the
> needs and estate of the child. The judge may enter an order
> requiring any one or more of the above-mentioned parties
> to provide for the support of the child as may be
> appropriate in the particular case, and if appropriate the
> court may authorize the application of any separate estate
> of the child to his support. *However, the judge may not
> order support to be paid by a person who is not the child's
> parent or an agency, organization or institution standing in
> loco parentis absent evidence and a finding that such
> person, agency, organization or institution has voluntarily
> assumed the obligation of support in writing.*

N.C. Gen. Stat. § 50-13.4(b) (emphasis added).

North Carolina General Statute Section 50-13.4(b) does not mention the

marital status or sex of a person standing in *loco parentis*; it applies simply to "a

person who is not the child's parent . . . standing in *loco parentis*[.]" *Id.* Thus, North

Carolina General Statute Section 50-13.4(b) applies to Partner because she is "a

person who is not the child's parent . . . standing in *loco parentis*." *Id.*

North Carolina General Statute Section 50-13.4(b) was first adopted in 1967

and has not been significantly amended since it changed the liability framework

between parents in 1981, but the history of the statute aids in understanding the differences between primary and secondary responsibility for child support as well as the allocation of primary liability to the "mother" and "father" of a child. *See* N.C. Gen. Stat. § 50-13.4 (1967); N.C. Gen. Stat. § 50-13.4 (1976 & Supp. 1979); N.C. Gen. Stat. 50-13.4 (1981). Section 50-13.4(b) states, "In the absence of pleading and proof that the circumstances otherwise warrant, the father and mother shall be primarily liable for the support of a minor child." N.C. Gen. Stat. § 50-13.4(b). Even before the adoption of Chapter 50 of the North Carolina General Statutes, common law recognized that both parents of a child, mother and father, owe a duty of support to the child. *See Lee v. Coffield*, 245 N.C. 570, 572, 96 S.E.2d 726, 728 (1957) ("The fact that the father, during life, is primarily responsible for the support, maintenance, and education of his minor children does not relieve the mother of her responsibility. Upon the death of the father, a duty rests on the mother to the best of her ability to provide for the support of her children. This we conceive to be the common law as adopted by North Carolina." (citation omitted)).

Before amendments to North Carolina General Statute Section 50-13.4 in 1981, the law set different child support standards for mothers and fathers. *See* N.C. Gen. Stat. § 50-13.4(b) (1967). The father of a child was primarily liable for financial support of the child; the mother had secondary liability and would be ordered to pay child support only if the father could not provide full support for the child. *See id.* The statute held the father primarily liable for child support and the mother

secondarily liable from the time of adoption of Section 50-13.4 in 1967 through 1981:

> (b) In the absence of pleading and proof that circumstances of the case otherwise warrant, the father, the mother, or any person, agency, organization or institution standing in loco parentis shall be liable, *in that order*, for the support of a minor child. *Such other circumstances may include, but shall not be limited to, the relative ability of all the above-mentioned parties to provide support or the inability of one or more of them to provide support, and the needs and estate of the child.* Upon proof of such circumstances the judge may enter an order requiring any one or more of the above-mentioned parties to provide for the support of the child, as may be appropriate in the particular case, and if appropriate the court may authorize the application of any separate estate of the child to his support.

N.C. Gen. Stat. § 50-13.4 (1976 & Supp. 1979) (emphasis added).

The Supreme Court of North Carolina noted the primary responsibility of the father for child support based on the plain language of Section 50-13.4:

> Taken together, [§ 50-13.4(b) and (c)] clearly contemplate a mutuality of obligation on the part of both parents to provide material support for their minor children where circumstances preclude placing the duty of support upon the father alone. Thus, where the father cannot reasonably be expected to bear all the expenses necessary to meet the reasonable needs of the children, the court has both the authority and the duty to order that the mother contribute supplementary support to the degree she is able.
>
> . . . .
>
> *The statute places primary liability for the support of the minor child on the father. Therefore, . . . the father of the minor child, is primarily liable for support of the child. It is his responsibility to pay the entire support of the child in the absence of pleading and proof that circumstances of the*

*case otherwise warrant. The mother's duty is secondary.*

*In re Register*, 303 N.C. 149, 153-54, 277 S.E.2d 356, 359 (1981) (emphasis added) (citations, quotation marks, and alterations omitted).

In 1981, Section 50-13.4(b) was amended to make the mother and father of a child *both* primarily liable for child support. *See* N.C. Gen. Stat. § 50-13.4(b) (1981) ("In the absence of pleading and proof that the circumstances otherwise warrant, *the father and mother shall be primarily liable for the support of a minor child. . . .* Such other circumstances may include, but shall not be limited to, the relative ability of all the above-mentioned parties to provide support or the inability of one or more of them to provide support, and the needs and estate of the child. The judge may enter an order requiring any one or more of the above-mentioned parties to provide for the support of the child as may be appropriate in the particular case[.]" (emphasis added)). The Supreme Court of North Carolina clarified the effect of the 1981 amendment in *Plott v. Plott* by footnote:

> Prior to the statutory amendments to G.S. 50-13.4 in 1981, the father had the primary duty of support, while the mother's duty was only secondary. In cases decided under the prior version of 50-13.4(b), the courts softened the financial burden placed on fathers by reading subsections (b) and (c) to G.S. 50-13.4 together. These companion subsections were interpreted as contemplating a mutuality of obligation on the part of both parents to provide material support for their minor children where circumstances preclude placing the duty of support upon the father alone. Prior case law interpreted this statute as requiring the trial court to first find that the father alone could not make the entire payment before the mother could be required to

> contribute. Practically all states have imposed on mothers an equal duty to support.

313 N.C. 63, 67 n.1, 326 S.E.2d 863, 866 n.1 (1985) (citations and quotation marks omitted). "Today, the equal duty of both parents to support their children is the rule rather than the exception in virtually all states. The parental obligation for child support is not primarily an obligation of the father but is one shared by both parents." *Id.* at 68, 326 S.E.2d at 867 (citation, quotation marks, and alterations omitted).

Another important addition in the 1981 amendment to Section 50-13.4 was the addition of the words "secondary liability" for those standing in *loco parentis* and the clarification as to when that secondary liability would attach. *See* N.C. Gen. Stat. § 50-13.4 (1981) (stating there would be no secondary liability "absent evidence and a finding that such person, agency, organization or institution [standing in *loco parentis*] has voluntarily assumed the obligation of support in writing.").[4]

Here, although Partner does stand in *loco parentis* to Alisa, she did not "voluntarily assume[ ] the obligations in writing." *See* N.C. Gen. Stat. § 50-13.4 (2019). There was no written agreement for Partner to assume a child support obligation for Alisa. There are no findings of fact in the Support Order and no evidence to show Partner assumed this obligation in writing.[5]

---

[4] Based upon the findings of fact, "[t]he parties jointly selected a [sperm] donor for the IVF process[.]" Thus, there is no "father" of the child available to contribute to the support of the child.

[5] There is a finding in the Support Order that "[Partner] presented [Mother] with a parenting agreement, but that agreement was never signed."

The trial court found Partner "signed IVF paperwork which equally bound her to the risks and rewards of the IVF process." But the IVF paperwork addressed mostly the medical "risks and rewards" of the procedure, not the legal responsibilities. Furthermore, the IVF paperwork includes a section entitled "Legal Considerations and Legal Counsel." This section informs the parties:

> The law regarding embryo cryopreservation, subsequent thaw and use, and parent-child status of any resulting child(ren) is, or may be, unsettled in the state in which either the patient, spouse, partner, or any donor currently or in the future lives, or the state in which the ART ["Assisted Reproductive Technology"] program is located.

The parties acknowledged they had not received legal advice from the IVF procedure and that they should consult an attorney with any questions regarding "individual or joint parental status as to a resulting child."

The trial court also found Partner "continuously provided health insurance for [Alisa]. To do so, [Partner] signed documents claiming [Alisa] as her dependent and sought reimbursement for certain medical expenses." Again, this finding notes Partner "signed documents" for insurance purposes, but there is no indication in the evidence that these documents addressed child support in any way. Partner's provision of medical insurance for Alisa supports the trial court's finding Partner stood in *loco parentis* to Alisa, but it is not a voluntary assumption of a child support obligation. *See* N.C. Gen. Stat. § 50-13.4. Because Partner never assumed a child support obligation in writing, Partner could not be held secondarily liable for child

support. *See id.* ("[T]he judge may not order support to be paid by a person who is not the child's parent or an agency, organization or institution standing in loco parentis absent evidence and a finding that such person, agency, organization or institution has voluntarily assumed the obligation of support in writing.").

Indeed, imposing even secondary liability for child support based solely upon Partner's *de facto* parental relationship with Alisa and her custodial rights would be contrary to the long-established law applicable to heterosexual couples in the same situation. *See generally Duffey v. Duffey*, 113 N.C. App. 382, 438 S.E.2d 445 (1994); *Moyer*, 122 N.C. App. 723, 471 S.E.2d 676. A parent's romantic partner or a stepparent may have a close and loving relationship with the biological child of her partner and may even have custodial rights under North Carolina General Statute Section 50-13.2, but the romantic partner or stepparent has no secondary child support obligation unless it was voluntarily assumed in writing. *See* N.C. Gen. Stat. § 50-13.4. Ironically, any attempt to treat a same-sex couple differently than a heterosexual couple as to the law to secondary liability for child support would lead to disparate outcomes and end up treating the child of a same-sex relationship *differently* than the child of a heterosexual relationship under the same circumstances.

In two cases, *Duffey v. Duffey* and *Moyer v. Moyer,* this Court clarified the requirement for a written agreement to establish secondary child support liability in the context of a de facto parent. *See Duffey*, 113 N.C. App. 382, 438 S.E.2d 445;

*Moyer*, 122 N.C. App. 723, 471 S.E.2d 676. In *Duffey*, the plaintiff-mother had a daughter before her marriage to the stepfather. *See Duffey*, 113 N.C. App. at 383, 438 S.E.2d at 446. The stepfather treated the stepdaughter as his own and intended to adopt her, but the adoption proceedings were never completed. *Id*. Three more children were born during the parties' marriage, although the stepfather was not the natural father of the last child, who was conceived after the parties' separation, but born before they were divorced. *Id*. After the parties separated, they executed a separation agreement addressing custody of the children. *Id*. The stepfather agreed to pay child support for each of the four children, including the two who were not his biological or adoptive children. *Id*. The separation agreement was later incorporated into the judgment of absolute divorce. *Id*. at 384, 438 S.E.2d at 446. The stepfather appealed from the trial court's order requiring him to pay child support, claiming the trial court had erred in interpreting the separation agreement and "the trial court's order requiring him to pay support for his stepchildren [was] void as against public policy." *Id*. at 384, 438 S.E.2d at 447.

On appeal in *Duffey*, this Court rejected the stepfather's argument and affirmed the trial court's order requiring him to pay child support for the two stepchildren because he stood in *loco parentis* to the children and had voluntarily assumed the child support obligation in the executed separation agreement:

> By signing the Separation Agreement in which he agreed
> to pay child support to plaintiff, defendant voluntarily and
> in writing extended his status of in loco parentis and gave

the court the authority to order that support be paid. This is all that is required by the express terms of N.C.G.S. § 50-13.4(b).

*Id.* at 385, 438 S.E.2d at 447-48.

This Court reasoned:

> Applying the applicable law to the facts of this case, the trial court found that defendant had voluntarily assumed an obligation of support for Derissa and Dominique and that he stood in loco parentis to these two stepchildren at the time of the execution of the Separation Agreement. We agree.

> All the evidence shows that defendant voluntarily accepted Derissa and Dominique into his home and that he acted as a father to his stepchildren. Defendant cared and provided for his stepchildren by supplying them with military identification and listing them as his dependents. Thus, there is no doubt that defendant stood in loco parentis to Derissa and Dominique during the term of his marriage to plaintiff.

*Id.* at 385, 438 S.E.2d at 447.

Similarly, in *Moyer v. Moyer*, this Court applied the same law but came to a different result because the stepfather had *not* formally entered into a written agreement to pay child support. *Moyer*, 122 N.C. App. at 725-26, 471 S.E.2d at 678. In *Moyer*, the parties were the child's biological mother and stepfather. *Id.* at 723, 471 S.E.2d at 677. The plaintiff-mother had a daughter from a past relationship when she married the stepfather in 1987. *Id.* at 723-24, 471 S.E.2d at 677. Together they had a son in 1990. *Id.* at 724, 471 S.E.2d at 677. During the marriage, the stepfather supported both children. *Id.* The parties separated in 1994 and signed an

informal hand-written agreement in which the stepfather agreed to pay $400 per month as child support for both children. *Id.* This agreement was not acknowledged. *Id.* The mother brought a claim against the stepfather for child support for both children, and the trial court concluded the stepfather was in *loco parentis* to the stepdaughter and ordered him to pay child support for her. *Id.* The stepfather appealed only "those portions of the order relating to support" of the stepdaughter. *Id.*

After this Court reviewed the development of the law regarding the obligation of a person standing in *loco parentis* to pay child support in detail, it went on to explain what evidence would be required for secondary liability for child support to attach to a non-parent standing in *loco parentis*:

> [T]he court may not order that support be paid by a person standing *in loco parentis* absent evidence and a finding that such person, agency, organization or institution has voluntarily assumed the obligation of support in writing. . . . If the rule were otherwise, a stepparent *in loco parentis* could find himself with a legal duty of support without the formalities required to bind a biological or adoptive parent to an identical obligation. Such a result is illogical, not in the interest of public policy, [because] it places a stricter duty on a stepparent *in loco parentis*, than on a biological or adoptive parent.

*Id.* at 725-26, 471 S.E.2d at 678-79 (citations omitted).

Our dissenting colleague relies upon *Price v. Howard,* 346 N.C. 68, 484 S.E.2d 528 (1997)), for the proposition that the duty of primary liability for child support should accompany the right to custody in this type of case. But in *Price*, the analysis

and holding addressed custody, not child support. *See generally id*. There is no mention of a child support claim or order in *Price v. Howard*. *See generally id*. The opinion did mention that the trial court's order on custody had also required the nonparent party to share therapy costs for the child, but the holding of the case addressed custodial rights. *See id*. at 84, 484 S.E.2d at 537. To the extent *Price* could be considered as a *sub silentio* ruling on some sort of child support obligation based upon the reference to therapy costs, *Price* refers only to potential secondary liability under North Carolina General Statute Section 50-13.4(b), not primary liability. The Court stated:

> Although support of a child ordinarily is a parental obligation, other persons standing *in loco parentis* may also acquire a duty to support the child. *See* N.C.G.S. § 50-13.4(b) (1995). It is clear that the duty of support should accompany the right to custody in cases such as this one. Therefore, upon remand, the trial court should reconsider the issue of who should bear the costs of the child's therapy in light of its ultimate custody award.

*Id*. Therefore, we do not consider *Price* as controlling authority on the issue of a nonparent's liability for child support.

Here, under *Duffey* and *Moyer*, the result as to secondary liability for child support would be the same as if Mother had been in a romantic relationship with, for example, an infertile man as her partner, and the unmarried couple had a child by

IVF using a sperm donor.[6] *See Duffey*, 113 N.C. App. 382, 438 S.E.2d 445; *Moyer*, 122 N.C. App. 723, 471 S.E.2d 676. Although the child may consider the man as her father, and he may act as a father to the child, and he may even be granted custodial rights, he still would have no child support obligation under North Carolina General Statute Section 50-13.4 *unless* he assumed the obligation in a writing.[7] *See* N.C. Gen. Stat. § 50-13.4. The law is the same for any partner or spouse standing in *loco parentis* to the child of his or her partner, no matter the sex of the parties, so in this case Partner cannot be held secondarily liable for child support.

## V. Conclusion

The trial court's attempt to impose one obligation of a mother or father – child support – upon Partner, to go along with the benefit of joint custody already conferred upon her is understandable. It may seem only fair for Mother and Partner to share

---

[6] If the mother is married, North Carolina General Statute Section 49A-1, entitled "Status of child born as a result of artificial insemination" may apply. N.C. Gen. Stat. § 49A-1 (2019). Section 49A-1 states, "Any child or children born as the result of heterologous artificial insemination shall be considered at law in all respects the same as a naturally conceived legitimate child of the husband and wife requesting and consenting in writing to the use of such technique." *Id.*

[7] Mother's brief noted that she could not find any law addressing an agreement to pay child support in a same-sex relationship. We recognize that *Duffey* and *Moyer* involved heterosexual couples and *Moyer* relied upon North Carolina General Statute Section 52-10.1 regarding agreements of a "married couple" to hold that the written agreement did not satisfy the formalities to order the stepfather to be obligated to pay child support to the stepchild. *Moyer*, 122 N.C. App. at 726, 471 S.E.2d at 679. Under North Carolina General Statute Section 12-3(16), a "married couple" could now include a same-sex married couple as a term "suggesting two individuals who are then lawfully married to each other[.]" N.C. Gen. Stat. § 12-3(16). Since the parties here were not married, Section 52-10.1 would not apply to them, but the requirement of Section 50-13.4 for the person standing in *loco parentis* to "voluntarily assume[ ] the obligation of support in writing" still applies to this case. N.C. Gen. Stat. § 50-13.4. Here, because there was no written agreement of any sort regarding child support, we need not address whether any particular level of formality is required for a written agreement regarding child support by a same-sex unmarried couple.

the responsibility of financial support for Alisa along with the benefits of joint physical and legal custody. It may seem just as fair to require a stepfather or male partner who stands in *loco parentis* to his partner's child to pay child support, especially if he also shares custody with the child's natural or legal parent. But here, North Carolina's statutes and established case law allow Partner to act as a parent to Alisa under Section 50-13.2 without paying child support under Section 50-13.4. *See* N.C. Gen. Stat. § 50-13.2 (stating custody may be awarded to "such person, agency, organization or institution as will best promote the interest and welfare of the child"); *see also* N.C. Gen. Stat. § 50-13.4 ("In the absence of pleading and proof that the circumstances otherwise warrant, the father and mother shall be primarily liable for the support of a minor child.").

We fully appreciate the difficult issues created by IVF and other forms of assisted reproductive technology, but only the General Assembly has the authority to amend our statutes to address these issues.[8] Protection of the children born into these situations, whether to a same-sex couple or a heterosexual couple, is a complex policy issue, but this Court does not have the role of creating new law or adopting new policies for our state. *See Allen v. Allen*, 76 N.C. App. 504, 507, 333 S.E.2d 530, 533 (1985) ("Issues of public policy should be addressed to the legislature.").

---

[8] For a full discussion of these issues, *see* The Honorable Beth S. Dixon, For the Sake of the Child: Parental Recognition in the Age of Assisted Reproductive Technology, 43 CAMPBELL L. REV. 21 (2021).

After our *de novo* review, we conclude the trial court erred by giving a "gender neutral" interpretation to North Carolina General Statute Section 50-13.4, ordering Partner to pay child support. Partner cannot be held primarily liable for child support because she is not Alisa's "parent" within the meaning of North Carolina General Statute Section 50-13.4(b). Partner cannot be secondarily liable for child support under North Carolina General Statute Section 50-13.4(b) because she did not assume an obligation to support Alisa in writing. We therefore reverse the Support Order and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Judge FLOOD concurs.

Judge HAMPSON dissents by separate opinion.

No. COA22-494 –*Green v. Carter*

HAMPSON, Judge, dissenting.[9]

In 1997, in *Price v. Howard*, our Supreme Court grappled with a child custody case involving an unwed heterosexual couple where the man—despite having believed he was the father and acted in all ways as the father to the parties' child—was determined to not actually be the biological father of the child. *Price v. Howard*, 346 N.C. 68, 70-71, 484 S.E.2d 528, 529 (1997). The man's name was not listed on the birth certificate, but his last name was given to the child. The man had exercised custody with the child. The man acted in all ways as a natural parent to the child. *Id.* There, our Supreme Court recognized that a biological mother may act inconsistently with her constitutionally protected status as a natural parent by ceding custodial and other parenting duties to a third-party where "[k]nowing that the child was her natural child, but not plaintiff's, she represented to the child and to others that plaintiff was the child's natural father. She chose to rear the child in a family unit with plaintiff being the child's *de facto* father." *Id.* at 83, 484 S.E.2d at 537.

Crucially, as it relates to this case, the Court concluded by reversing the mandate of the Court of Appeals which had, in turn, reversed the trial court's order

---

[9] I agree with the majority's statement of facts and analysis in Parts I and II of the Opinion of the Court. I respectfully dissent from Part III for the reasons stated. Although not necessary to my reasoning, and an issue I would not reach in this case, I concur in the result in Part IV, again, for reasons stated. I further dissent from the conclusion reached in Part V because—for all the reasons stated—the proper result here is to affirm the trial court.

requiring the parties to share therapy costs for the child. The Court stated: "Although support of a child ordinarily is a parental obligation, other persons standing *in loco parentis* may also acquire a duty to support the child. *See* N.C.G.S. § 50–13.4(b) (1995). It is clear that the duty of support should accompany the right to custody in cases such as this one." *Id.* at 84, 484 S.E.2d at 537.

Today, almost 28 years later, the majority effectively holds that—as it relates to an unwed same-sex couple—the duty of support, as a matter of law, does not accompany the right to custody in cases such as *this* one. To the contrary, the majority decision here concludes holding a woman in an unwed same-sex couple to the principle espoused by our Supreme Court in *Price* applicable to a man in an unwed heterosexual couple is, somehow, not gender-neutral. I disagree and respectfully dissent. The trial court's Order should be affirmed.

I.    Primary Liability of Child Support

In this case, as the trial court found, the pleadings and evidence establish circumstances warranting both parties in this case held primarily liable for the support of their minor child. Moreover, the trial court's Findings support its Conclusions of Law, including that Plaintiff and Defendant are parents of the minor child and owe a duty of support to their minor child under N.C. Gen. Stat. § 50-13.4. *See State o/b/o Midgett v. Midgett*, 199 N.C. App. 202, 205-06, 680 S.E.2d 876, 878 (2009) (recognizing the standard of review for child support orders is broadly an abuse of discretion but requires—as any bench trial—analyzing whether trial court's

findings are supported by evidence and, in turn, the findings support the conclusions of law). Three independent—but also interrelated—legal bases undergird this conclusion: (A) our case law derived from *Price* establishing partners—including but not limited to same-sex partners—of a biological parent may become *de facto* parents by assuming parental rights and responsibilities ceded by the biological parent; (B) collateral and judicial estoppel; and (C) the language of the child support statute itself.

### A. *De Facto Parent*

As it relates to this case, our Courts have subsequently followed the reasoning in *Price* and applied it—in gender neutral fashion—including to same-sex unwed couples. *See Ellison v. Ramos*, 130 N.C. App. 389, 396, 502 S.E.2d 891, 895 (1998) (female in unwed heterosexual relationship had standing to pursue custody action against biological father). In particular, in *Mason v. Dwinnell*, this Court applied *Price* to a custody determination involving a same-sex unwed couple who had a child through IVF. There, the trial court found:

> [The parties] jointly decided to create a family and intentionally took steps to identify [non-biological parent] as a parent of the child, including attempting to obtain sperm with physical characteristics similar to [non-biological parent], using both parties' surnames to derive the child's name, allowing [non-biological parent] to participate in the pregnancy and birth, holding a baptismal ceremony at which [non-biological parent] was announced as a parent and her parents as grandparents, and designating [non-biological parent] as a parent of the child on forms and to teachers.

*Mason v. Dwinnell*, 190 N.C. App. 209, 222-23, 660 S.E.2d 58, 67 (2008).  Moreover, after the child's birth:

> The findings of fact also reveal that [the parties] functioned as if both were parents, with [biological parent] agreeing to allow [non-biological parent] to declare the child as a dependent on her tax returns and the parties sharing caretaking and financial responsibilities for the child.  The court found, without challenge by [biological parent], that [biological parent] "encouraged, fostered, and facilitated the emotional and psychological bond between the minor child and [non-biological parent]" and that "[t]hroughout the child's life, [non-biological parent] has provided care for him, financially supported him, and been an integral part of his life such that the child has benefited from her love and affection, caretaking, emotional and financial support, guidance, and decision-making."  As a result, [non-biological parent] became "the only other adult whom the child considers a parent . . ."

*Id*. at 223, 660 S.E.2d at 67.  This Court held: "In sum, we conclude that the district court's findings of fact establish that [biological parent], after choosing to forego as to [non-biological parent] her constitutionally-protected parental rights, cannot now assert those rights in order to unilaterally alter the relationship between her child and the person whom she transformed into a parent."  *Id*. at 227, 660 S.E.2d at 70. We determined these findings supported the conclusion the biological parent had acted inconsistently with her constitutionally protected status as a parent.  *Id*. at 230, 660 S.E.2d at 71.  While we acknowledged our decision did not mean that "[non-biological parent] is entitled to the rights of a legal parent," *id*. at 227, 660 S.E.2d at 70, we noted the biological mother

> nonetheless voluntarily chose to invite [non-biological parent] into that relationship and function as a parent from birth on,

*HAMPSON, J., dissenting.*

> thereby materially altering her child's life. [Biological mother] gave up her right to unilaterally exclude [non-biological parent] (or unilaterally limit contact with [non-biological parent]) by choosing to cede to [non-biological parent] a sufficiently significant amount of parental responsibility and decision-making authority to create a permanent parent-like relationship with her child.

*Id.* at 226, 660 S.E.2d at 69. We went on to affirm the trial court's best interests determination awarding joint legal and physical custody to the parties. *Id.* at 233, 660 S.E.2d at 73.

What *Price, Mason*, and other cases recognize at law is that a person who is in a domestic or intimate relationship with the biological parent—but is not a biological parent to a child may, in fact, be "transformed into a parent": a de facto parent. *See Boseman v. Jarrell*, 364 N.C. 537, 552, 704 S.E.2d 494, 504 (2010); *Moriggia v. Castelo*, 256 N.C. App. 34, 53, 805 S.E.2d 378, 388-89 (2017); *Davis v. Swan*, 206 N.C. App. 521, 529, 697 S.E.2d 473, 478 (2010). This relationship exceeds that of a typical *in loco parentis* relationship—such as a step-parent relationship—where a person has become part of a child's life *in place of a parent* and taken on obligations and responsibilities associated with parenting. *See Liner v. Brown*, 117 N.C. App. 44, 48, 449 S.E.2d 905, 907 (1994) (quoting *Shook v. Peavy*, 23 N.C. App. 230, 232, 208 S.E.2d 433, 435 (1974) ("This Court has defined the term in loco parentis to mean "in the

place of a parent" and has defined "person in loco parentis" as "one who has assumed the status and obligations of a parent without a formal adoption.").[10]

The de facto parent relationship arises under "the circumstances of [a parent] intentionally creating a family unit composed of [themselves], [the] child and, to use the Supreme Court's words, a 'de facto parent.' " *Mason*, 190 N.C. App. at 225-26, 660 S.E.2d at 68 (quoting *Price,* 346 N.C. at 83, 484 S.E.2d at 537). This is so where a trial court in a custody case make findings that "establish that [the legal parent] intended—during the creation of this family unit—that this parent-like relationship would be permanent, such that [they] 'induced [non-parent and minor] to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated.' " *Id.* at 226, 660 S.E.2d at 69. The use of this de facto parenting relationship is one that was judicially created and recognized as a basis for a judicial determination a parent had acted inconsistently with their parental status to permit the de facto parent standing to seek legal and physical custody of their child.

In this case, Plaintiff utilized this de facto parent concept to obtain legal custody. In her Amended Complaint for Custody, Plaintiff alleged "Plaintiff has a parent-child relationship with the minor child and the minor child refers to Plaintiff

---

[10] Notably, however, for purposes of asserting *in loco parentis* as a defense to a criminal offense, we have held the *in loco parentis* "relationship is established only when the person with whom the child is placed intends to assume the status of a parent by taking on the obligations incidental to the parental relationship, particularly that of support and maintenance." *State v. Pittard*, 45 N.C. App. 701, 703, 263 S.E.2d 809, 811 (1980).

as "Mom" or "Mama." Plaintiff further alleged: the parties jointly entered into an assisted reproductive technology agreement; Plaintiff's heavy involvement in the IVF process—including jointly selecting a sperm donor and the storage and freezing of embryos and Plaintiff's payment of costs associated with storage and "significant sums towards the costs of IVF treatment"; Plaintiff's participation in appointments during the pregnancy; Plaintiff's provision of health insurance for Defendant including for IVF treatments, doctor's visits, and delivery; Plaintiff's adding the child as a dependent on her health insurance; Plaintiff's provision of "substantial funds" and "financial assistance" to Defendant to assist in providing for the child's needs and expenses—including daycare expenses; and joint sharing of parental responsibilities.

The trial court relied on many of these facts to conclude Plaintiff has a "parent/child relationship with the minor child and has standing to seek custody of the minor child against" Defendant—including specifically Plaintiff's provision of health insurance for the child and coverage of IVF treatments, payment of uninsured medical expenses for the child, and payment of daycare expenses. The trial court—in the custody order—expressly found Plaintiff "bonded with the minor child and formed a parent-child like relationship with the minor child." Based on its Findings, the trial court ultimately concluded: "The parties are fit and proper *parents* to have joint legal custody of the minor child and to share physical custody of the minor child . . ." (emphasis added). In granting joint legal custody, the trial court awarded Plaintiff final decision-making authority regarding the child's education. The trial

court further ordered the parties to alternate physical custody on holidays and special occasions including Thanksgiving, Christmas, and Mothers' Day.

No party has challenged this custody order. Specifically, the parties do not challenge the trial court's Findings and Conclusions that a parent-child relationship existed between Plaintiff and the minor child or, indeed, that Plaintiff is a fit and proper parent to have custody of the minor child. Indeed, the custody order appears consistent with the holdings of *Price* and *Mason* in its analysis of the relationship between Plaintiff and the minor child and whether Defendant "intended—during the creation of this family unit—that this parent-like relationship would be permanent, such that [they] 'induced [Plaintiff and the minor child] to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated.' " *Mason*, 190 N.C. App. at 225-26, 660 S.E.2d at 69 (quoting *Price*, 346 N.C. at 83, 484 S.E.2d at 537).

As such, Plaintiff was transformed into a parent—certainly a *de facto* parent—through the parties' actions. Because of that particular status and relationship with the minor child—based on the principles espoused in *Price* and applied in *Mason*—Plaintiff sought and obtained legal custody of the child.[11] Consistent with *Price*, then, "[i]t is clear that the duty of support should accompany the right to custody in cases

---

[11] "Although not defined in the North Carolina General Statutes, our case law employs the term 'legal custody' to refer generally to the right and responsibility to make decisions with important and long-term implications for a child's best interest and welfare." *Diehl v. Diehl*, 177 N.C. App. 642, 646, 630 S.E.2d 25, 27-28 (2006) (citations omitted).

such as this one." *Price*, 346 N.C. at 84, 484 S.E.2d at 537. Indeed, the trial court—expressly echoing our Supreme Court in *Price*—found "De Facto Mother has enthusiastically and voluntarily held herself out as a parent to the minor child and has a support obligation that accompanies her, now court ordered, right to 50/50 custody. The duty of support should accompany the right to custody in cases such as this one."

### B. Collateral and Judicial Estoppel

Although not expressly applied in the trial court's order in this case, undergirding its reasoning are the two related concepts of collateral and judicial estoppel. The trial court recognized Plaintiff had litigated the issue of her de facto parentage of the minor child to obtain custody in the very same case file in which the child support order was ultimately entered. The trial court determined that having prevailed on that issue in the custody proceeding under based on allegations of a parental relationship and her assumption of the rights and duties of a parent—including providing health insurance and other financial support for the child—and having been adjudged in the custody order to be a parent to the minor child, Plaintiff should not then be permitted to disavow the parental relationship to avoid paying child support.

"Under the doctrine of collateral estoppel, also known as 'estoppel by judgment' or 'issue preclusion,' the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party

against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Strates Shows, Inc. v. Amusements of America, Inc.*, 184 N.C. App. 455, 461, 646 S.E.2d 418, 423 (2007) (citation and quotation marks omitted). "Collateral estoppel bars the subsequent adjudication of a previously determined issue, even if the subsequent action is based on an entirely different claim." *Id.* (citation and quotation marks omitted). "The elements of collateral estoppel are as follows: (1) a prior suit resulting in a final judgment on the merits; (2) identical issues involved; (3) the issue was actually litigated in the prior suit and necessary to the judgment; and (4) the issue was actually determined." *Hillsboro Partners, LLC v. City of Fayetteville*, 226 N.C. App. 30, 37, 738 S.E.2d 819, 825 (2013) (citation and quotation marks omitted). Notably "the fact that a prior judgment was based on an erroneous determination of law or fact does not as a general rule prevent its use for purposes of collateral estoppel." *Thomas M. McInnis & Assocs., Inc. v. Hall*, 318 N.C. 421, 431, 349 S.E.2d 552, 558 (1986).

Although a related concept, judicial estoppel differs from collateral estoppel in three ways:

> First, judicial estoppel seeks to protect the integrity of the judicial process itself, whereas collateral estoppel and res judicata seek to protect the rights and interests of the parties to an action. Second, unlike collateral estoppel, judicial estoppel has no requirement that an issue have been actually litigated in a prior proceeding. Third, unlike collateral estoppel, judicial estoppel has no requirement of "mutuality" of the parties in either its offensive or defensive applications.

*Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 16, 591 S.E.2d 870, 880–81 (2004) (citations omitted). "[B]ecause of its inherent flexibility as a discretionary equitable doctrine, judicial estoppel plays an important role as a gap-filler, providing courts with a means to protect the integrity of judicial proceedings where doctrines designed to protect litigants might not adequately serve that role." *Id.* at 26, 591 S.E.2d at 887.

In *Whitacre*, the North Carolina Supreme Court identified three factors used to determine the applicability of judicial estoppel:

> The first factor, and the only factor that is an essential element which must be present for judicial estoppel to apply, is that a "party's subsequent position 'must be clearly inconsistent with its earlier position.'" Second, the court should "inquire whether the party has succeeded in persuading a court to accept that party's earlier position." Third, the court should inquire "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Judicial estoppel is an "equitable doctrine invoked by a court at its discretion."

*Price v. Price*, 169 N.C. App. 187, 190-91, 609 S.E.2d 450, 452 (2005) (quoting *Wiley v. United Parcel Serv., Inc.*, 164 N.C. App. 183, 188, 594 S.E.2d 809, 812 (2004) (citations omitted)).

Applying collateral estoppel, there was a prior suit between these parties which resulted in a permanent custody order constituting a final judgment on the merits. *See* N.C. Gen. Stat. § 50-19.1 (2023). The custody suit as with the child support action involved the issue of whether Plaintiff was, de facto, a parent of the

child. The issue was actually litigated in the custody suit and necessary to the judgment because absent a determination Plaintiff was a de facto parent, Plaintiff would not have had standing to seek custody of the minor child. Finally, the trial court determined Plaintiff had formed a parent-child relationship—and, thus, Plaintiff was a de facto parent of the child. Indeed, the trial court in the custody proceeding went further: finding both Plaintiff and Defendant were "fit and proper parents." Critically on the facts of this case, without these determinations, the trial court could not have awarded Plaintiff the legal custody of the minor child Plaintiff sought. The trial court's adjudication in the custody action precludes Plaintiff from contending she is not, in fact, a parent of the minor child in a later child support proceeding.

Judicial estoppel is equally, if not more, applicable. First, in her initial Complaint for custody, Plaintiff alleged the minor child was "her child." In the Amended Complaint, Plaintiff referred to herself as "Mom." Plaintiff further alleged she has "a parent-child relationship with the minor child." Plaintiff alleged that part of this relationship was the fact she provided financial support for the child, including health insurance. For Plaintiff to claim herself as a parent providing support for the child in the custody action while claiming not to be a parent to disavow any obligation to support her child is clearly inconsistent. For example, Plaintiff alleged she acted as a parent to the child by providing health insurance—but now seeks to claim she

12

should not be obligated to provide health insurance for the child under a support order because she is not a parent.

Second, Plaintiff absolutely succeeded in persuading the trial court she had a parent-child relationship with the child and convincing the court she was a fit and proper *parent* to exercise custody. Indeed, the trial court awarded her joint legal custody including decision-making responsibilities and final decision-making authority over educational decisions.

Third, permitting Plaintiff's inconsistent position creates an unfair advantage by putting her in the position of having all the benefits of legal and physical custody with none of the legal support obligations. Defendant would suffer an unfair detriment in that Plaintiff may now make long-term decisions with financial ramifications for the child, including specifically educational decisions, which Defendant would be solely responsible for paying. Indeed, Plaintiff's position may even have detrimental impacts on the child if Plaintiff is no longer obligated to provide financial support or health insurance for the child.

As such, Plaintiff, having claimed a parent-child relationship as a de facto parent to the child to wrest custody, at least in part, away from Defendant should be estopped in the subsequent child support proceeding from denying that she is a parent to the child for purposes of her support obligation.

C.    *Child Support Statute*

*HAMPSON, J., dissenting.*

Ultimately, however, it is the plain language of the child support statute itself that provides for Plaintiff to share in the primary liability for child support. Section 50-13.4(b) expressly provides: "*In the absence of pleading and proof that the circumstances otherwise warrant,* the father and mother shall be primarily liable for the support of a minor child." N.C. Gen. Stat. § 50-13.4(b) (2023) (emphasis added).

In this case, the trial court expressly found "pleading, proof and circumstances" warranting holding both parties equally liable for child support of their child, including many facts that were also used to establish Plaintiff's custodial rights. Plaintiff has not challenged any of these Findings on appeal. Those Findings are, thus, binding on this Court on appeal. *Cash v. Cash*, 286 N.C. App. 196, 202, 880 S.E.2d 718, 725 (2022). In turn, they support the trial court's conclusion Plaintiff should be held liable for child support as a lawful parent. *See id.*

Again, crucially, Plaintiff has been found by a court in a custody action to be a parent to the minor child. This parental status was not thrust unwittingly upon Plaintiff. Plaintiff voluntarily assumed this status even before the birth of the child. Plaintiff actively advocated for this status in the custody proceeding. Plaintiff has not challenged any Finding of Fact in the support order reaffirming the parental status she obtained through her custody action. As a parent, Plaintiff may be held liable for child support. *See* N.C. Gen. Stat. § 50-13.4(b) ("However, the judge may not order support to be paid by a person who is not the child's parent . . . absent evidence and a finding that such person, agency, organization or institution has

14

voluntarily assumed the obligation of support in writing."). Indeed, the facts and circumstances of this case compel the conclusion Plaintiff should be held primarily liable for the support of her child along with Defendant. *See id.*

Thus, the trial court's Findings support its determination under Section 50-13.4(b) that Plaintiff and Defendant should be held primarily liable for child support. Therefore, the trial court did not err in ordering Plaintiff to pay child support in this case. Consequently, the trial court's Order should be affirmed.

II.     Secondary Liability for Child Support

As I would conclude on the facts and circumstances of this case Plaintiff is primarily liable for child support and would affirm the trial court on that basis, I would not otherwise reach the issue of secondary liability for child support. However, I do agree with the majority to the extent that if Plaintiff is determined to not be a parent to the child, then, in the absence of a written assumption of the support obligation, Plaintiff may not be held secondarily liable for support. If, as Plaintiff claims, she is nothing more than a temporary *in loco parentis* figure to Defendant's child with no real duties or obligations, then it follows Plaintiff cannot be held legally liable for the support of the child. However, it also follows that having disavowed any support obligation or parental status with respect to support, Plaintiff's custodial rights—obtained by her allegations of parental status and obligations—may be revisited. The trial court, on motion of a party, should consider whether Plaintiff's disavowal of her parental status and support obligation constitutes a substantial

*HAMPSON, J., dissenting.*

change of circumstances affecting the child warranting a modification of Plaintiff's legal and physical custodial rights in the child's best interests. *See* N.C. Gen. Stat. § 50-13.7 (2023). As in *Price*, the right to custody should accompany the duty of support in cases such as this one. *Price*, 346 N.C. at 84, 484 S.E.2d at 537.